**BATTLES FARM COMPANY et al., Plaintiffs,**

v.

**Carla A. HILLS, Secretary of the Department of Housing and Urban Development, Defendant.**

**Civ. A. No. 76–393.**

United States District Court,
District of Columbia,
Civil Division.

June 8, 1976.

Gerald Goldman, Hughes, Hubbard & Reed, Washington, D. C., for plaintiffs.

Paul T. Michael, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This is an action brought by four owners of federally subsidized, multifamily housing projects to obtain a subsidy enacted by Congress to enable these projects to keep pace with mounting utility bills and local property taxes and at the same time maintain rents paid by tenants at levels appropriate for the lower income families that they house. Faced with comparable actions, at least nine district courts throughout the United States have already held that this is a mandatory subsidy. This Court agrees and enters the following Findings of Fact and Conclusions of Law.

*Findings of Fact*

1. Plaintiffs Battles Farm Company, Bay Village Company, Cummings Towers Company, and Southfield Gardens Company are, respectively, the owner/mortgagors of the following projects that are insured and receive mortgage interest reduction payments under Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 ("Section 236"): Battles Farm FHA # 023–44075–LDP, containing 320 units, located in Brockton, Massachusetts; Bay Village FHA # 023–44005–LDP, containing 206 units, located in Fall River, Massachusetts; Cummings Towers FHA # 023–44072–LDP, containing 238 units, located in Boston, Massachusetts; and Southfield Gardens FHA # 023–44002–LDP, containing 200 units, located in Brockton, Massachusetts. Each of the aforementioned plaintiffs is a limited partnership created under the laws of Massachusetts and includes as a general partner Max R. Kargman.

2. Defendant Carla Hills is the Secretary ("Secretary") of the Department of Housing and Urban Development ("Department") and is responsible for executing, personally and through subordinates, Section 236.

3. The matter in controversy as to each plaintiff exceeds the sum of $10,000, exclusive of interest and costs, and arises under Section 236.

4. Congress enacted the National Housing Act to provide adequate housing to "families with incomes so low that they could not otherwise decently house themselves . . . ." 12 U.S.C. § 1701t. Section 236 is intended to further this goal by authorizing the Secretary to make interest reduction payments to mortgagees and to insure mortgages of Section 236 projects on behalf of the owner/mortgagors. 12 U.S.C. §§ 1715z–1(a) and (j). This subsidy, commonly referred to as the "production subsidy," enables project owners to charge lower rents to the tenants, since the subsidy results in lower operating costs. In return for the benefits of interest reduction payments and mortgage insurance, the project

owners are strictly regulated in the rents that they may charge and the profits that they may make. *See id.*, §§ 1715z–1(f)(1) and (e); 24 C.F.R. § 236.55; FHA Form No. 3136, ¶¶ 4(a), (b), (c), and (*1*), and 6(e)(1).

5. In 1974, Congress enacted the Housing and Community Development Act, Pub.L. 93–383, 88 Stat. 633, which added Section 236(f)(3) and amended Section 236(g) so as to provide for an "operating subsidy"—in addition to the production subsidy—to cover increased utility costs and local property taxes. 12 U.S.C. §§ 1715z–1(f)(3) and (g). Section 236(f)(3) provides in pertinent part:

"For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum . . . of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes, is reasonable and is comparable to cost increases affecting other rental projects in the community." 12 U.S.C. § 1715z–1(f)(3).

Section 236(g) provides:

"The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974." 12 U.S.C. § 1715z–1(g).

6. The Housing and Community Development Act of 1974 also amended Section 236 to provide for a "deep subsidy" in addition to the production subsidy. The deep subsidy is a type of rent supplement paid to owners of projects made subject to contracts under Section 236 after August 22, 1974, generally on behalf of tenants whose incomes are too low to afford basic rentals with 25 percent of their income. 12 U.S.C. § 1715z–1(f)(2).

7. In light of rising operating costs that were jeopardizing the viability of many projects, the Senate Banking, Housing and Urban Affairs Committee proposed the operating subsidy amendments to Section 236 specifically "to prevent excessive rent increases and assist sponsors [like plaintiffs] in meeting increases in operating costs beyond their control . . . ." S.Rep.No. 93–693, 93d Cong., 2d Sess. (1974), 3 U.S. Code Cong. & Admin.News 4273, 4302 (1974). The Committee explained:

"The Committee was concerned with the problem experienced by projects

where [operating] costs rise above those initially projected. Under the present program, there is no way of adjusting the subsidy to meet such costs, with the result that the burden falls upon lower income tenants, who may thus be required to pay far more than 25 percent of their incomes for their apartments." *Id.* at 4303.

Without proposing a solution, the House Committee on Banking and Currency similarly observed:

"One of the problems with the Section 236 rental assistance program is that the amount of the subsidy is fixed for forty years. Thus as real estate taxes and other operating costs increase at a rate faster than the incomes of tenants, rents must be increased until at some point the project becomes economically unfeasible, vacancies mount, and the project fails." H.R.Rep.No.1114, 93d Cong., 2d Sess. 21 (1974).

The operating subsidy program was intended to solve these problems. In the Secretary's own words, "The operating subsidy amendments were enacted to alleviate the financial hardships, generated by escalating utility rates and tax increases, which threaten the owners of HUD subsidized, multifamily projects and the tenants residing in those projects." Affidavit of Carla Hills, sworn to on March 23, 1976, ¶ 8, filed in this case.

8. The problems that Section 236 projects face because of increased utility costs and property taxes are severe. In the debates on the Housing and Community Development Act of 1974 Senator Brock observed:

"In the case of section 236 . . . the administration estimated in its housing study last year that 1 project in 5 would fail within 10 years. It has now begun to appear that even these estimates were conservative—more than 20 percent will come back to FHA [on default] and they will come back sooner than expected." 120 Cong.Rec. S. 3353 (March 11, 1974, daily ed.).

On April 8, 1975, the Department itself issued a notice of hearings to address default and foreclosure problems, stating: "The Department of Housing and Urban Development is concerned about the increasing number of defaults in repayment of mortgage loans on [HUD] subsidized multifamily projects and the impact of such defaults on low- and moderate-income tenants, the community at large, and [HUD's] mortgage insurance funds." 40 Fed.Reg. 15928. And on November 5, 1975, Senator Brooke reported to the Senate Committee on Banking, Housing and Urban Affairs Committee that "over 25 percent of all Section 236 projects [in Boston] are currently defaulting on mortgage payments." Hearing on Oversight of HUD Housing Programs before the Senate Comm. on Banking, Housing and Urban Affairs, 94th Cong., 1st Sess. 14.

9. The excess rental reserve fund created under Section 236(g) contained at least $46,328,900 as of March 31, 1976, $18 million of which the Department estimates it plans to refund to project owners as prior overpayments to the fund.

10. As of September 30, 1975, the Department effectively had a balance of unreserved contract authority for implementation of Section 236 of at least $90,757,490. As of February 29, 1976, this balance totaled at least $39.8 million. Of this amount the Department plans to use: (a) $27.2 million to contract or to amend contracts for production subsidies, (b) another $5.8 million for deep subsidies pursuant to Section 236(f)(2), and (c) the remaining $6.8 million for deep subsidies to Section 236 projects that had received a commitment by the Department for production subsidies before August 22, 1974, but were not finally endorsed nor receiving production subsidy payments until after that date.

11. Plaintiffs have each qualified for operating subsidies since February 18, 1975. The sum of the cost of utilities and local property taxes for each of their projects would have exceeded initial operating expense levels if the Secretary had established such levels and also have exceeded thirty

percent of tenants' incomes. The increase in the cost of utilities or local property taxes has been reasonable and comparable to cost increases affecting other rental projects in the relevant community.

12. Except as required by court order in lawsuits before this one, the Secretary has made no effort to implement the operating subsidy program, notwithstanding requests to do so. Exhibits B though D to plaintiffs' verified complaint are true and accurate copies of letters dated March 14, 1975, June 10, 1975, and January 22, 1976, respectively, from Max R. Kargman to various Department officials, including the Secretary, protesting the Department's failure to implement and provide operating subsidies.

13. On April 12, 1976, the Senate Committee on Banking, Housing and Urban Affairs, which authored the operating subsidy program and is the Senate committee charged with overseeing its implementation, stated in reporting out S. 3295:

> "The reserve [fund] is required under Section 236(g) of the Act to be used for additional operating assistance payments under the terms specified in Section 236(f)(3). The Committee is concerned that HUD has not yet implemented this provision of the 1974 Act." S.Rep.No.94–749, 94th Cong., 2d Sess. 10 (1976).

14. Plaintiffs are suffering irreparable injury as a result of the Secretary's failure to implement the operating subsidy program in their behalf in that:

(a) The increased costs of utilities and local property taxes cannot be passed along to tenants without forcing substantial numbers to quit the premises, go on rent strike, be evicted, or pay greatly in excess of thirty percent of their incomes for rent, contrary to the objectives of Sections 236(f)(3) and (g);

(b) If rents are increased to offset the increased costs of utilities and local property taxes in full, at least some tenants will quit the premises, go on rent strike, or require eviction. To the extent that this occurs, plaintiffs will suffer losses that can never be recovered; and

(c) Plaintiffs cannot fairly bear the increased costs of utilities and local property taxes, since they are now unable to meet or are barely meeting operating expenses and debt service. Without operating subsidies, the risk of foreclosure for at least some of the plaintiffs accordingly increases substantially, to the detriment of these plaintiffs, their tenants, and the Department. Indeed, plaintiff Battles Farm Company has already been notified that the Department will foreclose upon its project unless one half of the interest deficiency on the mortgage is remitted to the Department.

15. Awarding plaintiffs injunctive relief compelling implementation of the operating subsidy program in their behalf will cause no undue harm or prejudice to third parties and will promote the public interest by requiring the Secretary to perform her statutory duties.

### Conclusions of Law

1. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and 1361; 5 U.S.C. §§ 701–706; and 11 D.C. Code § 521. In addition, the Court may grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202, there being an actual controversy between the parties.

2. Sovereign immunity is no bar to the award of relief in this action. Sovereign immunity does not extend to acts by an officer of the United States in excess of statutory authority or in derogation of a statutory duty. *E. g., Guadmuz v. Ash,* 368 F.Supp. 1233, 1238 (D.D.C.1973), and cases cited therein. In addition, the National Housing Act waives sovereign immunity by providing in 12 U.S.C. § 1702 that the Secretary may "sue and be sued in any court of competent jurisdiction, State or Federal" in connection with the performance of her duties under the Act. *E. g., Federal Housing Administration v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *Trans-Bay Engineers & Builders, Inc. v. Lynn,* 396 F.Supp. 265, 268 (D.D.C.1975); *Ghent v. Lynn,* 392 F.Supp. 879 (D.Conn.1975). *See also United States v. Commonwealth of*

*Pennsylvania,* 394 F.Supp. 261, 265 n. 8 (M.D.Pa.1975).

3. The operating subsidy program established by Sections 236(f)(3) and (g), 12 U.S.C. §§ 1715z–1(f)(3) and (g), is a mandatory program. *Accord, Ross v. Community Services Inc.,* 396 F.Supp. 278 (D.Md. C.A. No. H–75–506, Dec. 31, 1975); *Ross v. Community Services Inc.,* 396 F.Supp. 278 (D.Md.1975); *DuBose v. Hills,* 405 F.Supp. 1277 (D.Conn.1975); *Abrams v. Hills,* 415 F.Supp. 550 (C.D.Cal. C.A. No. 75–3009 JWC Dec. 19, 1975), *motion for rehearing denied* (May 6, 1976); *Harrison v. Hills,* (W.D.Pa. C.A. No. 75–938, Oct. 1, 1975); *Carberry v. Hills* (D.Mass. C.A. No. 75–521–F, March 8, 1976); *Parker Square Tenants Ass'n v. HUD* (W.D.Mo. C.A. No. 75CV577–W–3, Jan. 27, 1976); *Gertsch v. Hills,* 414 F.Supp. 15 (D.Utah C.A. No. C 75–513, March 5, 1976); *Folsom Gardens Action Comm. v. Hills,* E.D.Cal. C.A. No. S–76–43–TJM, Feb. 12, 1976; *Campbell v. HUD,* N.D.Ohio C.A. No. C 75–471, Dec. 22, 1975. The Secretary has been under a legal duty since 180 days after August 22, 1975, i. e., since February 18, 1975, to establish initial operating expense levels for plaintiffs' projects and to make and contract to make operating subsidy payments to plaintiffs.

4. The Secretary is not required to obligate contract authority to make operating subsidy payments to plaintiffs from the excess rental reserve fund created under Section 236(g). Nor is the Secretary required under that provision to determine that the balance in the fund is adequate to meet estimated operating subsidy payments for all Section 236 projects before making such payments to plaintiffs. Moreover, the reserve fund does not become unavailable to make operating subsidy payments on June 30, 1976, but remains indefinitely available for that purpose.

5. The Secretary is required to make operating subsidy payments from the excess rental reserve fund created under Section 236(g) and, to the extent necessary, from unobligated contract authority which is currently available or which shall become available.

6. Since there is no genuine dispute as to the material facts and judgment should be entered for plaintiffs as a matter of law, their motion for summary judgment should be granted, and defendant's cross-motion for summary judgment should be denied. Plaintiffs consequently are entitled to declaratory relief in accordance with these conclusions of law. Plaintiffs are also entitled to a writ of mandamus and a permanent injunction ordering the Secretary to establish initial operating expense levels for plaintiffs' projects and to make and contract to make operating subsidy payments to plaintiffs from February 18, 1975, forward and to continue to make such payments periodically as the availability of funds permits.

An Order consistent with the foregoing Findings of Fact and Conclusions of Law has been filed this date.