703 F.2d 1292
 227 U.S.App.D.C. 70
 BATTLES FARM COMPANY, et al., Appellants
v.
Patricia Roberts HARRIS, Secretary of the Department of
Housing and Urban Development.
BATTLES FARM COMPANY, et al.
v.
Patricia Roberts HARRIS, Secretary of the Department of
Housing and Urban Development.
 Nos. 76-1641, 76-1642.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1977.
Decided April 1, 1983.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 76-0393).
 Gerald Goldman, Washington, D.C., with whom Philip A. Lacovara, Washington, D.C., was on the brief, for appellants in 76-1641 and appellees in 76-1642. Peter M. Kreindler, Washington, D.C., also entered an appearance for appellants in 76-1641.
 Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee in 76-1641 and cross-appellant in 76-1642. Stanley S. Harris, U.S. Atty., Washington, D.C., entered an appearance for appellee in 76-1641 and cross-appellant in 76-1642. John S. Koppel, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee in 76-1641.
 Before MacKINNON, Circuit Judge, and BAZELON and McGOWAN, Senior Circuit Judges.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 Battles Farm Co., and three other owners of low-income housing projects, challenge the failure of the Secretary of Housing and Urban Development (Secretary) to implement an "operating subsidy" plan for low-income housing projects pursuant to Sec. 236 of the National Housing Act, 12 U.S.C. Sec. 1715z-1 (1976).[1] Under the operating subsidy program payments were made to owners of low-income housing for increases in local property taxes and utilities. These payments operated to insulate low-income tenants from paying rents in excess of thirty percent of their incomes as a result of such increased costs. 12 U.S.C. Sec. 1715z-1(f)(3) (1976). The District Court concluded that the Secretary was required to implement the program and ordered that retroactive subsidy payments be made to the project owners. Battles Farm Co. v. Hills, 414 F.Supp. 521, 526 (D.D.C.1976).
 
 
 2
 Both the Secretary and Battles Farm appealed issues resolved against them by the District Court. After oral argument, this Court sua sponte ordered the case held in abeyance pending the Supreme Court's disposition of two related class actions brought by low-income tenants seeking to compel implementation of the operating subsidy program. Battles Farm Co. v. Harris, Nos. 76-1641, 76-1642 (D.C.Cir. June 23, 1977). See Abrams v. Hills, 547 F.2d 1062 (9th Cir.1976), cert. granted, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1977), vacated and remanded, 455 U.S. 1010, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1982); Ross v. Community Services, Inc., 544 F.2d 514 (4th Cir.1976), cert. granted, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), vacated and remanded, 455 U.S. 1010, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1982). These class actions were subsequently settled by the Secretary in an agreement with the nationwide class of plaintiff tenants whereby payments were made directly to tenants to compensate for increased rents paid because operating subsidies had not been paid to owners of housing projects. Underwood v. Harris, No. 76-469 (D.D.C. Apr. 5, 1979) (Order Approving Stipulation of Settlement). Accordingly, the Supreme Court never considered the merits of the issues presented in this case. Abrams v. Hills, supra; Ross v. Community Services, Inc., supra.
 
 
 3
 In February 1982, this Court requested the parties to report on the status of this case. Battles Farm Co. v. Harris, Nos. 76-1641, 76-1642 (D.C.Cir. Feb. 17, 1982). Subsequently, we ordered supplemental briefing by the parties "with respect to whether any or all of the appellants' claims have been rendered either moot or frivolous on the merits or, more particularly, whether a remand to the District Court should be made for reconsideration in light of developments which occurred subsequent to the issuance of its" prior order. Id. (July 7, 1982). Briefs have been submitted and there appear to be two issues remaining in dispute between the parties.
 
 I.
 
 4
 Battles Farm asserts that the District Court erred in calculating the retroactive subsidy payment owed by the Secretary on the basis of the rent which the owners actually charged rather than on the rent which they claim they would have charged had the Secretary implemented the operating subsidy program. Battles Farm argues that the owners refrained from charging the maximum permissible rent because the low-income tenants would not have been able to pay that rent without the subsidies and, therefore, would have left the projects. Since it was the Secretary's failure to implement the subsidy program which caused the owners to continue lower rents, Battles Farm contends that the retroactive subsidy payment ordered by the District Court should have been based on the maximum permissible rent.
 
 
 5
 The Secretary responds that the Housing Act by its terms refers to the "basic rentals" approved by the Secretary, and that the rents charged here were those sought by the owners and approved by the Secretary. Further, the Secretary argues that it is sheer speculation to claim that the owners would have charged higher rent if the operating subsidy program had been implemented. Consideration of this issue is not mooted by the settlement with the nationwide class of tenants. The owners essentially argue that they were damaged by the lack of an operating subsidy program because they would have charged and received higher rents funded by that program. Thus this issue is ripe for our resolution.
 
 
 6
 We do not agree that the owners' claim is speculative. If the Secretary had implemented the subsidy program, the only reason owners would not have sought the full basic rental allowable would have been to maintain rents at less than thirty percent of their tenants' incomes--perhaps to induce them not to leave the premises or go on rent strike. Under the terms of the statute, however, the only way to maintain rents at less than thirty percent of the tenants' incomes would have been for the owners to forgo operating subsidies entirely.[2] Clearly if, during the period when the subsidy program was not implemented, Battles Farm and the other project owners kept rents at or above thirty percent of their tenants' incomes--which appears likely in view of the District Court's finding that raising rents any further would have forced "substantial numbers [of tenants] to quit the premises, go on rent strike, be evicted, or pay greatly in excess of thirty percent of their incomes for rent," Battles Farm Co. v. Hills, supra, 414 F.Supp. at 525--it is a fair inference that the owners would not have forgone the operating subsidies in order to reduce rents to below thirty percent of their tenants' incomes. Rather, the owners would have sought the maximum subsidy allowable.[3]
 
 
 7
 Thus we think it is not speculative but virtually certain that, as long as the actual rent charged by the owners was less than the maximum basic rental they could have charged but greater than or equal to thirty percent of their tenants' incomes, the owners are entitled to retroactive subsidy payments. Presumably tenants who paid rents above thirty percent of their incomes have been reimbursed by the Underwood settlement. The project owners, however, are still owed the difference between the amount they would have received under the subsidy program, assuming they sought and received the maximum allowable subsidies for their projects, and the actual rent they received from their tenants.[4]
 
 
 8
 If, on the other hand, the owners charged rents less than thirty percent of their tenants' incomes during the period when the subsidy program was not implemented, then the owners are owed no retroactive subsidies because it is clear that the owners would have forgone the subsidies in order to maintain lower rents. Of course, if the owners charged rents equal to the maximum basic rental allowable, then they are likewise not entitled to retroactive subsidy payments because the owners have already received the full amount of the subsidy, albeit from their tenants and not the Secretary.
 
 
 9
 In the face of the owners' apparent entitlement to retroactive subsidy payments, we do not think we are bound by the Secretary's characterization of the rent sought by the owners as the statutory "basic rentals" for the projects in question. This characterization is not so certain as to require this Court to do an inequity. "Basic rentals" are the rentals required to provide a certain return on investment to the project owners, assuming a government subsidized mortgage. See 12 U.S.C. Sec. 1715z-1(f)(1) (1976). See also Dew v. McLendon Gardens Assocs., 394 F.Supp. 1223, 1227-29 (N.D.Ga.1975) (describing Secretary's formula for fixing allowable basic rentals). But as the Secretary acknowledged at the time, the rents sought by the owners were considerably below the basic rentals permitted by the Secretary's formulas. Joint Appendix at 205, 207-08, 212. Thus the rents were apparently not set as envisioned by the statute. In these circumstances, the Secretary's labeling of these rents as "basic rentals" is not binding on this Court.
 
 
 10
 We therefore remand this case to the District Court to calculate, consistent with this opinion, the retroactive subsidies, if any, owed to Battles Farm and the other project owners.[5]
 
 II.
 
 11
 Battles Farm further argues that the District Court erred in refusing to order the Secretary to enter into long-term contracts for operating subsidies for the projects. It asserts that if the subsidy program was mandatory, so too was the Secretary's obligation to contract for such subsidies. The Secretary counters that although he may have been obliged to establish the subsidy program, it was within his discretion to determine how best to implement that program. He further claims that his decision not to enter into long-term contracts for the subsidy payments was reasonable. Finally, the Secretary argues that subsequent events indicate that Congress did not intend to require him to contract for subsidy payments. In particular, the Secretary points to the 1977 amendments to the operating subsidy program limiting his authority to contract for subsidies to one-year periods[6] as indicating that Congress did not expect the Secretary to enter into long-term contracts for subsidy payments.
 
 
 12
 Battles Farm's argument on this issue is weak. It cites nothing to indicate that the Secretary was obliged to contract for subsidy payments. The Housing Act merely authorized the Secretary "to make, and contract to make" such payments. 12 U.S.C. Sec. 1715z-1(f)(3) (1976). Although the Secretary has now made subsidy payments to the tenants, the Housing Act leaves the implementation of the subsidy program to his discretion. Furthermore, the Secretary correctly notes that no court has ever adopted the interpretation of the Housing Act advanced by Battles Farm. See, e.g., Abrams v. Hills, supra, 547 F.2d at 1068-70; Underwood v. Hills, 414 F.Supp. 526, 531 (D.D.C.1976); Battles Farm Co. v. Hills, supra, 414 F.Supp. at 526; Dubose v. Hills, 405 F.Supp. 1277, 1286-88 (D.Conn.1975); Ross v. Community Services, Inc., 405 F.Supp. 831, 835-36 (D.Md.1975), aff'd, 544 F.2d 514 (4th Cir.1976), cert. granted, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), vacated and remanded, 455 U.S. 1010, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1982).
 
 
 13
 This issue is also ripe for our resolution. It is not rendered moot by the settlement with the nationwide class of tenants or by the elimination of the operating subsidy program by Congress. If, in fact, the Secretary was obligated to enter into long-term contracts for the payment of the operating subsidies, Battles Farm would presumably have such a contract and be entitled to continuing subsidy payments. We agree with the other courts that have ruled on this issue, i.e., that the Secretary was not required to enter into long-term contracts for operating subsidies. Id. Accordingly, we affirm the District Court on this issue.
 
 III.
 
 14
 We accordingly affirm the District Court on the "long-term contract" issue and remand the "retroactive payment" issue to the District Court for further proceedings, consistent with this opinion, to calculate the retroactive subsidy payments, if any, owed the owners. This panel retains jurisdiction of any subsequent appeal of the case.
 
 
 15
 Judgment accordingly.
 
 
 
 [1]
 Congress restructured the operating subsidy program in 1977, Housing and Community Development Act of 1977, Pub.L. No. 95-128, Sec. 206, 91 Stat. 1111, 1130 (codified at 12 U.S.C. Sec. 1715z-1(f)(3) (Supp.I 1977)), and eliminated the operating subsidy program in 1978 in favor of an alternative "troubled projects" program, which relies on different criteria to determine a project's eligibility for and amount of financial assistance under the Housing Act. Housing and Community Development Amendments of 1978, Pub.L. No. 95-557, Sec. 201, 92 Stat. 2080, 2084 (codified at 12 U.S.C. Secs. 1715z-1(f)(3), (g), 1715z-1a (Supp.V 1981))
 
 
 [2]
 See 12 U.S.C. Sec. 1715z-1(f)(3) (1976) (Secretary authorized to pay subsidy equal to "the amount by which the sum of the costs of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum ... of the income of the tenants occupying such units")
 
 
 [3]
 For example, if the basic rental allowable for a particular unit was $200 per month, increased utility and property tax costs for that unit were $60 per month, and thirty percent of the occupying tenant's income was $150 per month, then the operating subsidy would be $50 per month, the amount necessary to maintain the tenant's actual rent at thirty percent of income. Reducing the basic rental to $175 per month would not benefit the tenant or the owner because the subsidy would simply be reduced to $25 per month. Only if the owner reduced the basic rental to less than $150 per month--thus foregoing any operating subsidy--would the tenant's actual rent be reduced. Thus, as long as owners were willing to charge rents of at least thirty percent of their tenants' incomes, there was absolutely no reason not to charge the maximum allowable basic rental and receive the maximum subsidy
 
 
 [4]
 For example, if the owner of the unit described in footnote 3, supra, charged the occupying tenant rent of $160 per month before the subsidy program was implemented, the owner would be entitled to a retroactive subsidy payment of $40 per month, the difference between the maximum amount the owner would have received with full subsidy ($200 per month) and the actual rent he received ($160 per month)
 There is one situation where the amount of the retroactive subsidy owed to the owners is subject to some uncertainty. Under certain circumstances--e.g., a project with exceedingly poor tenants or with high unsubsidized costs raising the basic rental without increasing the allowable subsidy--if the owner charged the maximum basic rental, the allowable subsidy would not reduce rents to thirty percent of his tenants' incomes. Under these circumstances, the owner might not charge the maximum basic rental in order to maintain rents at thirty percent of tenants' incomes, thereby avoiding rent strikes or evictions. Even if the owner charged rents in excess of thirty percent of tenants' income prior to the implementation of the subsidy program, it is not certain that the owner would have charged the maximum basic rental after implementation because of the countervailing consideration of maintaining tenants' actual rents at manageable levels.
 Proof of what the owners would have charged in this situation is uncertain because it is difficult to know what actual rental level above thirty percent of tenants' incomes the owners would have believed the tenants would accept. Nevertheless, the owners may be able to prove this figure with circumstantial evidence. For example, the owners may be able to show that they consistently charged actual rents in excess of thirty percent of their tenants' incomes once the subsidy program was implemented. Battles Farm and the other project owners are entitled to offer such evidence, if relevant to their situations.
 For example, assuming the total increase in utility and tax costs for the unit described in footnote 3, supra, was only $30 per month, if the owner charged the occupying tenant the maximum basic rental of $200 per month, the tenant would have to pay an actual rent of $170 per month, well in excess of thirty percent of his income. In this case, the owner might choose to reduce the basic rental to $180 per month and maintain the tenant's actual rent at $150 per month--thirty percent of income--while still collecting the maximum subsidy from the government ($30 per month). If prior to implementation of the subsidy program the owner charged the tenant $160 per month, it is certain that the owner is entitled to a retroactive subsidy payment of at least $20 per month, the difference between the minimum rental the owner would have charged to receive the maximum subsidy ($180 per month) and the actual rent received ($160 per month). However, if the owner can prove, for example, that after implementation of the subsidy program he charged rent of $185 per month, thus requiring his tenant to pay $155 per month, then he is entitled to a retroactive subsidy payment of $25 per month.
 
 
 [5]
 Because we hold that the retroactive subsidy payments must be calculated by subtracting the rents actually received from the rents the owners would have received had the subsidy program been implemented, we need not reach the Secretary's argument that awarding retroactive subsidy payments for rents actually received from tenants and reimbursed by the Underwood settlement would result in double subsidy payments. We note only that if the Secretary, pursuant to that settlement, paid the tenants more than they were entitled to, see Stipulation of Settlement, Underwood v. Harris, supra, at 5, p 3(b) (tenants' share of retroactive subsidy payment is total increase in tax and utility costs divided by number of apartments, regardless of amount of rent actually paid by tenants), so that retroactive subsidy payments to the owners now will result in payment of a portion of the subsidy twice, the blame for that result lies with the Secretary for agreeing to the erroneous settlement formula, and not with the owners. We cannot allow the Secretary's error to cause loss to the project owners who were not parties to the Underwood settlement
 
 
 [6]
 See note 1 supra