**BATTLES FARM COMPANY, et al.**

v.

**Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development, Appellant (Two Cases).**

**BATTLES FARM COMPANY, et al., Appellants,**

v.

**Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development.**

**Nos. 85–5945, 85–5957 and 85–5968.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1986.

Decided Dec. 12, 1986.

John S. Koppel, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellant in Nos. 85–5945 and 85–5957 and cross-appellee in No. 85–5968.

Thomas D. Goldberg, with whom Gerald Goldman, Washington, D.C., was on the brief for appellees in Nos. 85–5945 and 85–5957 and cross-appellants in No. 85–5968.

Before STARR and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

We have before us the attorneys fees phase of a lengthy lawsuit brought by Battles Farm Co., the owner of a low-income housing project, against the Secretary of Housing and Urban Development. After winning on the merits in part of their suit, the plaintiffs applied for, and the district court awarded, attorneys fees under the Equal Access to Justice Act ("EAJA").[1] Because we find the Secretary's position on the merits of the lawsuit to have been substantially justified, we reverse the district court's fee award.

I.

This litigation began on March 8, 1976, when Battles Farm sued HUD Secretary Carla Hills for refusing to pay low-income housing project operating subsidies under the 1974 amendments to the National Housing Act.[2] These amendments "authorized" the Secretary to make "operating subsidy" payments to project owners to help defray their increased expenses, thus minimizing the rents they charged tenants. See 12 U.S.C. § 1715z–1(f)(3) (1976). The amendments contemplated two means by which the Secretary would make such payments. First, the Secretary was authorized to make subsidy payments from a "rental reserve fund"—a fund consisting of excess rental charges remitted by project owners to the Secretary. See id. at 1715z–1(g). Second, the Secretary was authorized to enter into long-term contracts commit-

---

1. Pub.L. No. 96–481, §§ 201–208, 94 Stat. 2321, 2325–30 (1980). The portions of the Act pertaining to awards of fees by courts are codified at 28 U.S.C. § 2412 (Supp. V 1981). Battles Farm's fee claim was brought under the 1981 version of the EAJA.

2. Housing and Community Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633 (1974). In 1978, Congress repealed the operating subsidy program, Housing and Community Development Amendments of 1978, Pub.L. No. 95–557, 92 Stat. 2080.

ting HUD to pay these subsidies for an extended period of time. *See id.* at § 1715z–1(f)(3). Secretary Hills, believing that she had discretion not to implement the operating subsidy program and believing that HUD resources were better spent on other housing programs, declined to make subsidy payments from either source. This decision generated numerous lawsuits by housing project owners and tenants, all seeking to compel the Secretary to make such payments.

Battles Farm's lawsuit contained two interrelated claims: that the Secretary was obligated to use the rental reserve fund to make subsidy payments, therefore entitling Battles Farm to retroactive subsidy payments from the fund; and, under the same statutory provision, the Secretary was also obligated to enter into a long-term contract with Battles Farm guaranteeing to continue these subsidy payments for the forty-year life of the project. When this lawsuit began, nine different district courts had already held the Secretary was obligated to make subsidy payments from the rental reserve fund. But no court had yet ruled on the long-term contract issue—no other plaintiffs had brought such a claim. The Secretary defended the lawsuit, arguing that she was neither required to make subsidy payments from the rental reserve fund, nor required to enter into long-term contracts. The district judge ruled for the plaintiffs on the rental reserve fund claim and for the defendant on the long-term contract claim. *Battles Farm Co. v. Hills,* 414 F.Supp. 521 (D.D.C.1976). In calculating the amount of subsidies owed to Battles Farm, the judge limited the award by basing it on the rents Battles Farm actually charged during the pendency of the lawsuit, rather than the rents it would have charged had HUD implemented the subsidy program. Both sides appealed their re-

spective losses, and the Secretary agreed to begin making subsidy payments to Battles Farm during the pendency of the appeal.

The litigation then entered a dormant phase lasting almost six years. During this period, a number of contradictory events occurred: the Fourth and Ninth Circuits ruled against HUD on the rental reserve fund issue;[3] the Supreme Court granted certiorari to review both of those decisions;[4] this court ordered the *Battles Farm* appeal held in abeyance pending the Supreme Court's review of the Fourth and Ninth Circuit cases; a successor HUD Secretary settled eleven rental reserve fund lawsuits in 1978, agreeing to pay some $60 million in subsidies; and, also in 1978, Congress terminated the operating subsidy program.

The *Battles Farm* litigation came back to life in February, 1982, when this court reactivated the appeal.[5] In the second phase of the litigation, HUD Secretary Samuel Pierce dropped HUD's earlier argument that the Secretary had discretion not to make subsidy payments. Instead, he merely defended Battles Farm's appeal of the district court's ruling limiting the amount of retroactive subsidies owed by HUD. He also defended against Battles Farm's argument that the Secretary was required to enter into a long-term subsidy contract. This court issued its decision in April, 1983, agreeing with Battles Farm on the calculation of retroactive subsidies due, but affirming the district court's rejection of Battles Farm's long-term contract claims. *Battles Farm Co. v. Harris,* 703 F.2d 1292 (D.C.Cir.1983). Thus, when the dust had settled on the merits phase of the lawsuit, Battles Farm had prevailed on its claim for rental reserve fund subsidies and HUD had prevailed on its refusal to enter into a long-term contract.

This obviously defeated the purpose of our holding the *Battles Farm* appeal in abeyance: to await the Supreme Court's guidance on the issues presented in that appeal. We have no explanation for why the case remained in limbo for three years after the settlement.

---

**3.** *Ross v. Community Services, Inc.,* 544 F.2d 514 (4th Cir.1976); *Abrams v. Hills,* 547 F.2d 1062 (9th Cir.1976).

**4.** 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977).

**5.** The Supreme Court never heard the *Abrams* and *Ross* cases because of the 1978 settlement.

Battles Farm then applied for attorneys fees under the EAJA.[6] The Secretary opposed the application on the grounds that its position in the underlying litigation had been "substantially justified." In an unpublished opinion, the district court determined that the Secretary's position had not been substantially justified and so awarded $152,063.60 in attorneys fees, paralegal expenses, and costs. The Secretary now appeals, arguing that the district court erred both as to its "substantially justified" determination and as to its rulings on other aspects of the fee award.[7] Battles Farm cross-appeals from the district court's decision to limit plaintiffs' reimbursement for paralegal costs.

## II.

The Equal Access to Justice Act is a fee-shifting statute that allows certain private parties to recover attorneys fees and other costs incurred as a result of litigation against the federal government. But unlike other fee-shifting statutes that are designed solely to encourage private "attorneys general" to bring meritorious litigation in the public interest [8] and therefore ignore the reasonableness of the government's litigating position, the EAJA's purpose is somewhat different. It is designed to encourage small private plaintiffs and defendants to persevere against or resist the U.S. government if the government takes an unjustified litigating position.[9] And, perhaps more importantly, the statute is meant to discourage the federal government from using its superior litigating resources unreasonably—it is in this respect an "anti-bully" law. Thus, under the EAJA it is not enough that the private party "prevail" against the government in order to obtain attorneys fees. The government has the opportunity to show that its litigating position was "substantially justified;" [10] if it meets that burden, the court cannot award attorneys fees. *Spencer v. NLRB*, 712 F.2d 539, 557 (D.C.Cir. 1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984).[11] Whether the

---

6. The district court had rejected Battles Farm's request for attorneys fees in 1976 because there was no statutory authorization for such an award. On April 21, 1983, Battles Farm asked this court to remand the attorneys fees issue to the district court in view of the 1981 enactment of the Equal Access to Justice Act. (A party to a lawsuit pending as of October 1, 1981, the effective date of the Act, is eligible for attorneys fees, *see Cornella v. Schweiker*, 728 F.2d 978, 988 & n. 16 (8th Cir.1984)). In response, we vacated the district court's 1976 ruling and remanded the attorneys fees issue to the district court.

7. Because we hold the Secretary's litigating position was substantially justified, we do not address the other arguments raised on appeal.

8. *See, e.g.*, Civil Rights Attorney's Fees Awards Act of 1976, *codified at* 42 U.S.C. § 1988 (1982) (awarding attorneys fees to prevailing party in civil rights suits against the government); Civil Rights Act, *attorneys fees provision codified at* 42 U.S.C. 2000a-3(b) (1982) (awarding attorneys fees to prevailing party in lawsuits alleging discrimination in public accommodations).

9. *See* Pub.L. No. 96–481, § 202, 94 Stat. 2321, 2325 (1980). The Act may have assumed an additional purpose as a result of a recent amendment, *see* note 15, *infra*, that requires the government to *also* justify its administrative position.

10. The full text of the 1981 version of the pertinent statute reads:

   Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was *substantially justified* or that special circumstances make an award unjust.

   28 U.S.C. § 2412(d)(1)(A) (Supp. V 1981) (emphasis added).

11. The House and Senate Reports accompanying the Act seek to define "substantially justified." "The test of whether or not a Government action is substantially justified is essentially one of reasonableness. Where the Government can show that its case had a reasonable basis both in law and fact, no award will be made." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10 (1980) U.S.Code Cong. & Admin.News 1980, pp. 4953, 4989; S.Rep. No. 253, 96th Cong., 1st Sess. 6 (1979). In *Spencer*, we interpreted "substantially justified" as requiring the government's position to be "slightly more" than reasonable. 712 F.2d at 558. Yet the operative portion of that opinion makes no distinction between "reasonable" and "slightly more than

government's position was substantially justified depends to an important degree on the clarity of the governing law at the time the government made its litigating decision—if the extant law is clearly against the government, its position is not considered substantially justified. *Id.* at 559.

The government contends that its litigating position on the rental reserve fund issue was substantially justified because the governing law was unsettled at the time the original lawsuit was filed and remained so throughout the litigation. To offset the nine adverse district court decisions, the government relies on a favorable (if not directly on point) prior decision of this Circuit,[12] as well as subsequent developments, particularly the Supreme Court stay [13] and grant of certiorari in similar cases.[14] The government also argues that the work Battles Farm's lawyers devoted to the long-term contract claim, on which the government prevailed, is separable from fees sustained on the rental reserve fund claim. Battles Farm, on the other hand, argues that we should focus primarily on the governing law with respect to the rental reserve fund issue at the time the lawsuit was initially filed—when nine district courts had directly held against the government on that question. Battles Farm maintains that we should give no weight to the Supreme Court's grants of stay and certiorari; if we look to subsequent events at all we should be influenced by the government's settlement of the rental reserve fund issue in 1978. Finally, the appellee contends that the district court was correct in treating work done on both claims as interrelated.

We find it unnecessary to determine whether the government was separately justified in its litigating position on the rental reserve fund issue because we agree with both the district court and Battles

Farm that the two claims were interrelated. But this very interrelationship, which Battles Farm so vigorously asserts, paradoxically defeats its claim. The district court analyzed the case as if it were based on the "private attorneys general" fee-shifting statutes mentioned above. Under those statutes, courts merely divide claims into prevailing and losing issues and determine whether work on the latter can fairly be attributed to the former. Accordingly, the district court held that Battles Farm had prevailed on what it decided was the "central issue" in the case—the rental reserve fund issue. It then applied the prevailing party analysis of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) to conclude that the rental reserve fund issue was related to the long-term contract issue. But the court failed to consider whether the interrelated nature of the two claims bore on the Secretary's justification to defend the entire lawsuit. Instead, the court merely concluded that because the Secretary later settled the rental reserve fund issue, the government had made "an admission of insubstantiality" with regard to its position on the entire case.

Under the EAJA, the focus of a court's analysis must be on the justification of the government's overall litigating position at the time the government takes its position. When a case presents only a single issue, the court merely examines the extant governing law to see if the government's position has support. *See, e.g., Massachusetts Fair Share v. Law Enforcement Assistance Administration*, 776 F.2d 1066 (D.C. Cir.1985); *Grace v. Burger*, 763 F.2d 457 (D.C.Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 583, 88 L.Ed.2d 565 (1985); *Hirschey v. FERC*, 760 F.2d 305 (D.C.Cir.1985); *Spencer v. NLRB*, 712 F.2d 539. But, where as here, a plaintiff sues the govern-

---

reasonable." Indeed, the opinion holds that the government's position was substantially justified because it fell "within the bounds of 'reasonableness.' " *Id.* at 567.

**12.** *Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848 (D.C.Cir.1974).

**13.** On October 18, 1976, the Supreme Court granted stay of mandate in *Underwood v. Hills,* 414 F.Supp. 526 (D.D.C.1976), 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976).

**14.** 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977).

ment on two claims arising out of the same facts and involving an interpretation of common statutory sections, we think it artificial to consider only the strength of the government's argument on each issue. That is simply not the way litigation works. A lawyer faced with two interrelated claims against his client may well jeopardize one if he concedes the other. Therefore, a court's substantial justification inquiry must also take into account the effects of each claim upon the success or failure of the other.

In the initial phase of this lawsuit, Battles Farm made two claims against the government: the first for retroactive subsidy payments from the rental reserve fund and the second for a forty-year long-term contract. Although both the rental reserve claim and the long-term contract claim are premised on the asserted mandatory nature of the subsidy program, the long-term contract claim was far more costly and would have committed the department to carry out the operating subsidy program for *four decades*, an awesome precedent. There can be no doubt that the extant law on the long-term contract claim supported the Secretary's position. No court had, at the time the lawsuit began, ever held against the Secretary on the long-term contract issue. Moreover, the Secretary prevailed on the long-term contract claim both in the 1976 district court decision and in the 1983 circuit court decision (where, incidentally, we observed that "Battles Farm's argument on this issue is weak." *Battles Farm Co. v. Harris*, 703 F.2d at 1296). It is, therefore, hardly open to Battles Farm to assert the government was unjustified to defend against that claim. But the Secretary would have been disadvantaged in contesting the long-term contract claim without *also* defending the rental reserve fund claim—Battles Farm presented the claims as intertwined. Both the rental reserve fund claim and the long-term contract claim turned in large part on the interpretation of the same statutory language: "the Secretary is authorized to make, and contract to make, additional assistance payments." 12 U.S.C. § 1715z–1(f)(3). Battles Farm ar-

gued that "if the subsidy program was mandatory, so too was the Secretary's obligation to contract for such subsidies." *Battles Farm Co. v. Harris*, 703 F.2d at 1296. Battles Farm therefore defined the lawsuit; the Secretary might well have jeopardized her position on the long-term contract claim had she conceded the rental reserve fund claim. Indeed, a private lawyer who did so might be held liable for malpractice. For that reason alone, the Secretary's decision to defend the first phase of the lawsuit in 1976 was, at a minimum, substantially justified.

The 1978 nationwide settlement of the rental reserve fund issue does not affect our analysis because the settlement did not acknowledge the legitimacy of the long-term contract claim—indeed, no other plaintiff had even asserted such a claim. At that point, moreover, the government had won the long-term contract issue in the district court as against Battles Farm, and therefore was a good deal less vulnerable to that claim. In any event, we disagree with the district court's conclusion that a subsequent settlement *per se* undermines the justification of a government litigating position. The district court relied only on *dicta* in a *Spencer* footnote, 712 F.2d at 555 n. 58, for that proposition. And as the Second Circuit recently held in a similar case, such an approach might discourage the government's willingness to settle lawsuits. *Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir.1985).

Our conclusion does not suggest that whenever the government prevails on one claim in a lawsuit a private party cannot recover fees. If, for example, the government is the plaintiff and links a far-reaching and unreasonable claim to a justified one, the private party may well—as was the government here—be obliged to litigate the whole. If the claims are interrelated, the private party, under those circumstances, might well recover all its fees not withstanding a loss on one claim. Also, if the government as defendant raises two defenses that "stand on a different footing we will analyze each separately." *Cinciar-*

*elli v. Reagan,* 729 F.2d 801, 805 (D.C.Cir. 1984). We hold only that if a private plaintiff, in its complaint, combines one adventurous far-reaching losing claim with a more orthodox winning claim, and the two are intertwined, we must consider the justification of the government's *entire* litigating position before awarding attorneys fees. Just as the government must subsidize litigation costs when it "take[s] a long shot," *Spencer v. NLRB,* 712 F.2d at 558, so too must private parties bear the risks when it is they who aim for the fences.

We next consider the reasonableness of the government's litigating position in the second phase of the lawsuit. We might normally confine ourselves to examining the government's position solely at the beginning of a lawsuit. Otherwise, we could be compelled to evaluate the strength of the government's position in light of various judicial opinions issued during the pendency of the lawsuit, which could present the reviewing court with a analytical nightmare. Theoretically, the government's position might be initially justified, then unjustified because of other adverse opinions, then justified again because of favorable opinions, and on and on.[15] Nevertheless, here we must perform a second inquiry into the reasonableness of the government's position because the litigants themselves fundamentally restructured the lawsuit in 1982. By dropping its appeal of the rental reserve fund issue after the 1978 settlement, the government transformed this litigation from an interrelated two-issue case to a case containing two divisible questions: (1) whether calculation of the retroactive subsidies conceded-

ly due should be based on the actual rents Battles Farm charged its tenants or on the rents Battles Farm would have charged had the Secretary made payments in 1975 and 1976; and (2) the long-term contract issue. The transformation of the lawsuit compels us to re-examine the reasonableness of the government's litigating position in 1982, and to examine that position by reference to each of the two separate issues in the lawsuit, *see Martin v. Lauer,* 740 F.2d at 44.

We think it plain, however, that the Secretary was substantially justified in litigating both issues on appeal. We agreed with the government's argument on the long-term contract issue; its position on that issue can therefore hardly be deemed unjustified. While the government's 1976 district court victory on the subsidy calculation issue does not render its position on appeal *per se* justified, it is certainly evidence that the government's position here was reasonable, *see Cinciarelli v. Reagan,* 729 F.2d at 806. This was not a legal question upon which prevailing law clearly dictated a reversal of the district court; we merely weighed the competing arguments and decided that Battles Farm's method of calculating retroactive subsidies was more equitable. *See Battles Farm Co. v. Harris,* 703 F.2d at 1294–96. Having thus concluded that the government's litigating position in each phase of this litigation was substantially justified, we hold that Battles Farm is not entitled to attorneys fees under the EAJA.[16] The district court's award of such fees is therefore

*Reversed.*

15. Of course, a reexamination of the government's litigating position may be necessary when subsequent events change the character of the lawsuit. *See Martin v. Lauer,* 740 F.2d 36, 44 & n. 14 (D.C.Cir.1984).

16. The EAJA was amended in 1985 to provide that the "position" of the United States includes not only its litigating position but also "the action or failure to act by the agency upon which the civil action is based." Pub.L. No. 99–80, § 2(c)(2)(B), 99 Stat. 183, 185 (1985). We recently held in *Center for Science in the Public Interest v. Regan, et al.,* 802 F.2d 518

(D.C.Cir.1986) that the amended version of the Act applies to all lawsuits pending as of August 5, 1985. This lawsuit was pending on that date.

However, both parties explicitly stated in their briefs that the 1985 revision of the EAJA has no bearing on the issues in this case. Battles Farm has never argued that fees are awardable because the Secretary's *administrative action* was unjustified—its argument is simply that the Secretary's *litigating position* was unjustified. Likewise, the district court held only that the government's litigating position was unjustified. Thus, our denial of a fee award rests

solely on our conclusion that the government's litigating position was in fact justified.

Even if the argument had been made that the Secretary's refusal to pay operating subsidies was unjustified, it would likely not have persuaded us. When the Secretary made the administrative decision, only the *Lynn* case guided her action—and that case arguably supported her position. No courts, at that time, had yet ruled against the Secretary on this issue.