Ava P. TRAHAN, et al.

v.

Donald T. REGAN, Secretary of the Treasury, et al., Appellants.

No. 86–5051.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1986.

Decided July 28, 1987.

chael L. Paup, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Gill Deford, with whom Neal S. Dudovitz, Los Angeles, Cal., Michael R. Schuster, Eileen P. Sweeney and Richard Hubbard, Washington, D.C., were on the brief, for appellees.

Before: MIKVA, RUTH B. GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge SILBERMAN.

MIKVA, Circuit Judge:

The Secretary of the Treasury and the Commissioner of Internal Revenue Service (IRS) challenge the district court's award of attorney's fees and litigation costs incurred by appellees in a suit against the IRS. Appellees, current and former participants in the Supplemental Security Income (Benefits) program, filed their fees application under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp.III 1985), after obtaining a declaratory judgment preventing the IRS from releasing certain tax information to the Social Security Administration (SSA). The district court granted the application, holding that the challenged IRS action was not "substantially justified." We conclude that, under the standards governing EAJA fee awards, the district court correctly held that the IRS' position in this case was not "substantially justified." Further, we conclude that this case does not involve "special circumstances" that would make an award of fees unjust. Accordingly, we affirm the fee award.

## I. BACKGROUND

The litigation that precipitated the present fee proceeding arose from SSA's implementation of a new policy to verify the income and assets of Benefits recipients. The Benefits program, administered

Gayle P. Miller, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., Roger M. Olsen, Asst. Atty. Gen., and Mi-

by SSA, is designed to provide cash assistance to needy individuals who are elderly, blind or disabled. *See* Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c (1982). To be eligible for assistance, such individuals must meet financial qualifications established by SSA. *See* 42 U.S.C. § 1382; 20 C.F.R. §§ 416.1100–.1266 (1986). Regulations prescribed by SSA require Benefits recipients to supply the agency with the evidence necessary to prove eligibility and with any information that the agency requests. *See* 20 C.F.R. § 416.200. If an individual fails to comply with an SSA request, the agency may determine that the individual is ineligible to receive Benefits and suspend any further payments. *See* 20 C.F.R. §§ 416.1322, 416.-714(b). Before discontinuance of Benefits may occur, however, SSA must afford a recipient extensive procedural protections, including notice and a hearing. *See, e.g.,* 42 U.S.C. § 1383(c)(3); 20 C.F.R. §§ 416.-1336, 416.1407–.1494.

In order to ensure that SSA provides assistance only to eligible individuals and in correct amounts, the Social Security Act directs the agency to verify an applicant's representation of eligibility through corroborating evidence from other sources and additional information obtained as necessary. *See* 42 U.S.C. § 1383(e)(1)(B). The statute does not identify any specific sources for this supplemental evidence. Congress, however, required that other federal agencies "provide such information as the [SSA] needs for purposes of determining eligibility for or amount of benefits, or verifying other information with respect thereto." 42 U.S.C. § 1383(f).

Prompted by reports of widespread abuse in the Benefits program, the General Accounting Office (GAO), in two separate reports, recommended that the SSA verify eligibility by using tax information collected by the IRS. The International Revenue Code's (Code) stringent confidentiality requirements, however, erected a substantial roadblock to this source of information. The IRS may release tax data only as explicitly authorized by section 6103 of the Code. *See* 26 U.S.C. § 6103(a) (1982). The section lists many federal agencies to

which the IRS may release otherwise confidential tax information, but it does not authorize disclosure of the information at issue here to SSA. *See* 26 U.S.C. § 6103(c)–(o). Under subsection 6103(c), however, the IRS may release tax information, "subject to such requirements and conditions [as] it may prescribe by regulations, ... to such person or persons as the taxpayer may designate in a written request or a consent to such disclosure." In light of these provisions, GAO made two recommendations: GAO suggested that Congress amend the Code to provide specific authorization for the IRS to release the needed information to SSA or, in the alternative, that SSA attempt to obtain the desired information by soliciting the recipients' consent to such disclosure.

Because legislative change was not immediately forthcoming, the agencies pursued GAO's second recommendation. SSA, together with GAO and the IRS, developed a notice-and-consent form designed to give SSA access to the desired information pursuant to subsection 6103(c) of the Code. The form consisted of two parts. In the first part, SSA attempted to notify Benefits recipients of the purpose of their requested consent:

We want the [IRS] to give us information from your tax records. The [IRS] will give us the information if you sign the form below.

We will compare this tax information with what you told us about your income and what you own to make sure we are paying the right amount in your [Benefits] checks.

The notice then advised recipients that:

You have a choice about signing the form. But we must have accurate information about your income and what you own to pay your [Benefits] checks. If you do not sign the form, your [Benefits] checks may be affected.

The second part of the form constituted the recipient's "consent." It requested the recipient's signature, authorizing the IRS to disclose to SSA information relating to the recipient's unearned income. In a separate

document sent only to agency area office staff, SSA explained that those who refused to consent would be subject to suspension procedures. Refusal to sign the form apparently was, by itself, grounds for suspending Benefits. In May 1982, SSA mailed the form to each of four million former and current Benefits recipients. Almost three million recipients, including appellees, signed and returned the form to SSA, as SSA had requested.

In June 1982, eight Benefits recipients filed a class action against SSA alleging various statutory and constitutional violations with respect to the notice-and-consent forms. Plaintiffs sought to enjoin the SSA from gaining access to the tax information covered by the forms. The district court granted SSA's motion for summary judgment. The trial judge explained that because the case was "premature," he had dismissed the complaint without reaching the merits. *Tierney v. Schweiker*, Civ.Action No. 82–1638 (D.D.C. July 6, 1982). Plaintiffs appealed the decision to this court.

After the district court's dismissal in *Tierney*, SSA conveyed many of the signed forms to the IRS. Some of the same plaintiffs then filed suit against the IRS, alleging, *inter alia*, that the forms had been obtained by threat and coercion, rather than by consent, as required under subsection 6103(c) of the Code, and that the forms did not meet the requirements set forth in the applicable IRS regulations. Plaintiffs sought declaratory relief and an order enjoining the IRS from disclosing information based on the forms. A different trial judge dismissed the complaint on a variety of jurisdictional and remedial grounds, concluding that plaintiffs' claims were "insubstantial and frivolous." *Trahan v. Regan*, 554 F.Supp. 57, 63 (D.D.C.1982). Plaintiffs appealed this decision as well.

On appeal, this court consolidated the two cases. We reversed the ruling in *Trahan* and, as a result, found it unnecessary to reach the independent issues raised in *Tierney*. *See Tierney v. Schweiker*, 718 F.2d 449 (D.C.Cir.1983). Upon reaching the merits of the claims against the IRS,

we concluded that the notice-and-consent forms were invalid in two major respects. First, we held that the form "does not meet the requirements of the IRS' own regulations," and therefore any reliance on the forms by the agency would be "invalid." *Id.* at 455. The Treasury Regulations pertaining to subsection 6103(c) require that the consent "be in the form of a written document pertaining solely to the authorized disclosure" and contain specific information including "[t]he taxable year covered by the return or return information." 26 C.F.R. § 301.6103(c)–1(a) (1982). In this regard, the form at issue authorized the release of information "for all tax years beginning January 1, 1980, and subsequent." It contained no expiration date.

Second, emphasizing the importance of maintaining the confidentiality of tax returns, we found that the forms did not provide the "type of knowing and voluntary consent that [subsection 6103(c) of] the statute contemplates." *Id.* The forms failed to notify recipients of their procedural rights. And, as we found, because they "contained poorly-veiled threats that the recipients' benefits would be terminated if they failed to sign," the forms were likely to coerce recipients into relinquishing their statutory right to confidentiality. *Id.* at 456. Although we found that "the form used in this case [made] a mockery of the consent requirement," we specifically reserved judgment as to whether another form could result in knowing and voluntary consent. *Id.* In conclusion, we directed the district court to enter a declaratory judgment that reliance on the signed forms by the IRS to justify release of tax information would be unlawful. *See id.* at 457.

A concurring opinion in *Tierney* urged Congress to amend section 6103 of the Code to authorize the IRS to give the SSA the tax information it needed. *See id.* at 458–59. Congress so amended the statute in 1984. *See* 26 U.S.C. § 6103(*l*)(7), as amended by Section 2651(k)(1) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 1150.

After the district court entered the declaratory judgment as instructed, appellees

filed their application under the EAJA for attorney's fees and litigation costs. The district court granted appellees' motion, awarding them $25,743.73 in fees and $80.00 in costs. *Trahan v. Regan*, 625 F.Supp. 1163 (D.D.C.1985). In determining that appellants were liable, the court ruled that the 1985 amendments to the EAJA (Amendments) applied to the instant case. As a result of this ruling, the government was required to show that it was "substantially justified" in both its litigating position and its administrative acts or omissions that led to the filing of the underlying suit. *Id.* at 1165–66. The court looked to this court's opinion in the prior appeal to determine if the IRS' position was substantially justified. The district court first dismissed the government's contention that the IRS had not taken any "official" administrative action on the forms and that therefore there was no "position of the United States" in this case. In this regard, the court noted our observation in *Tierney* that the IRS appeared prepared to release the tax information and observed itself that the IRS had failed to reject the improper forms. Both, the court found, constituted "positions" for purposes of the EAJA. *Id.* at 1166–67. The court then concluded that the government's conduct at the agency level was not substantially justified because "the IRS was prepared to release tax information pursuant to consent forms which violated clear regulatory requirements." *Id.* at 1167. The court added that its conclusion was motivated, in part, by its conviction that "the EAJA should be construed to provide a greater 'incentive for careful agency action' where, as here, the agency's conduct involves a large number of people and affects their assertion of statutory rights." *Id.* at 1167 n. 5.

The government subsequently filed the present appeal. On appeal, the government no longer contends that the IRS had not taken any "position" with regard to the forms. Appellants instead focus their appeal on a challenge to the court's finding that the agency had not made the necessary showing to avoid liability under the EAJA.

## II. DISCUSSION

Congress passed the EAJA "to encourage relatively impecunious private parties to challenge unreasonable or oppressive governmental behavior by relieving such parties of the fear of incurring large litigation expenses." *Spencer v. NLRB*, 712 F.2d 539, 549 (D.C.Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). The key provision of the EAJA provides:

> [A] court shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action ..., including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412 (d)(1)(A) (Supp.III 1985).

Congress' 1985 Amendments to the EAJA modified the statute in several respects. As pertinent to this proceeding, the Amendments clarified the statute by resolving a split in the circuits concerning the meaning of the "position of the United States." *See Center for Science in the Public Interest v. Regan (CSPI)*, 802 F.2d 518, 523–24 (D.C.Cir.1986). The Amendments added a definition of that phrase which includes not only the government's litigating position but also "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D). This addition required a change in this circuit's substantial justification inquiry. We had construed the pre-1985 EAJA as requiring the court to scrutinize only the government's position in the litigation. *See Spencer*, 712 F.2d at 557. It is now clear that the court must examine both the government's litigating position and those agency actions that formed the basis of the litigation. *See Federal Election Commission v. Rose*, 806 F.2d 1081, 1086–87 (D.C.Cir.1986).

The government's challenge to the district court's determination of liability for

fees and costs raises three issues: first, whether the original EAJA or, alternatively, the EAJA as amended in 1985 applies to this case; second, whether the IRS' position in this case was "substantially justified"; and finally, whether the circumstances of this case make the award of fees unjust. The district court's decision involved only a determination of the governing law and its application of the undisputed facts. Thus, we must conduct a *de novo* review of these issues. *See id.* at 1091.

### A. *The 1985 Amendments*

■ The first issue is easily resolved. In amending the EAJA, Congress provided that "the amendments ... shall apply to cases pending on or commenced on or after the date of the enactment of this Act." 5 U.S.C. § 504 Note (Supp.III 1985). The IRS argues that Congress intended the Amendments to apply only to cases that were pending on the merits on August 5, 1985, the effective date of the Amendments. The IRS thus contends that the Amendments should not apply here because the merits portion of the case was resolved prior to August 5, 1985. Appellants' argument is foreclosed by this court's recent decision in *CSPI, supra. See Federal Election Commission,* 806 F.2d at 1086. In *CSPI,* we held that a case was "pending" for purposes of the EAJA Amendments if the fees application on the case was pending on August 5, 1985, even if the merits portion of the case had been resolved before that date. *See CSPI,* 802 F.2d at 524. Indeed, in reaching this conclusion, we cited the district court's opinion in this case with approval. *See id.* at 521. It is indisputable that appellees' fees application was pending on August 5, 1985. The district court was therefore correct in applying the Amendments to the instant proceeding and in examining whether the IRS' underlying administrative action was "substantially justified."

### B. *"Substantial Justification"*

■ The EAJA was not intended to be an automatic fee-shifting device in every case where the government loses on the merits. Under the EAJA, the government can avoid paying fees, notwithstanding its loss, if it can demonstrate that *both* its position during the litigation and its conduct that led to the litigation were "substantially justified." *See Federal Election Commission,* 806 F.2d at 1087 & n. 12. The underlying judgment on the merits is not controlling on assessment of the agency's position at either the administrative or the litigation level. At the EAJA stage of the proceeding, the court must make an independent evaluation of the government's action under the "substantially justified" standard.

■ Substantial justification means more than mere reasonableness. The EAJA would be a mere penalty box for gross misconduct if the government could avoid liability simply by arguing that some reasonable explanation or colorable legal basis existed to justify its having taken what was later held to be unlawful action. *See Federal Election Commission,* 806 F.2d at 1089. This circuit has characterized the substantial justification test as "slightly more stringent than one of reasonableness." *Blitz v. Donovan,* 740 F.2d 1241, 1244 (D.C.Cir.1984); *see Baker v. Commissioner of Internal Revenue,* 787 F.2d 637, 643 n. 10 (D.C.Cir.1986). Accordingly, a court considering a fees application under the EAJA must inquire if the government's actions were "slightly more than reasonable," even though not in compliance with the substantive legal standards applied in the merits phase of the litigation. *Federal Election Commission,* 806 F.2d at 1090.

■ When an agency action is invalidated as "arbitrary and capricious" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the agency nevertheless may be able to demonstrate substantial justification for its administrative action. "Arbitrary and capricious" is a term of art in the hands of a reviewing court and has connotations less pejorative than the plain meaning of the words would suggest. In *Federal Election Commission,* we examined at length the interaction between a finding at the merits phase that

the government's underlying was "arbitrary and capricious" and a later finding that the action was nonetheless "substantially justified." *See* 806 F.2d at 1087–90. We noted that courts invalidate agency action as "arbitrary and capricious" for a variety of reasons. Some reasons, such as a failure to provide an adequate explanation or failure to consider a relevant factor, have little to do with the reasonableness of the agency's conduct in light of the organic statute. Thus, an agency's failure to articulate adequately reasons for its action does not inevitably condemn the agency's regulatory action as unreasonable. *See id.* at 1088. Other reasons are more likely to indicate conduct that is not substantially justified. *See id.* at 1089 (using, as an example, an agency's failure to apply a rule in a situation to which it obviously pertains). Thus, analysis of the government's underlying position under the EAJA will vary considerably with the explanatory reasons for invalidating the agency action as "arbitrary and capricious."

■ By contrast, the government will rarely be able to demonstrate that its administrative action was substantially justified if that action has been invalidated for being "contrary to law," when that law is its own regulations or governing statute, as in this case. *See Tierney*, 718 F.2d at 455–56. This determination, in contrast to the "arbitrary and capricious" finding, inevitably reflects on the reasonableness of the agency's action in light of the organic law. Due to the deference granted the agency, the determination that an agency's action is contrary to law in this context is basically a determination that the agency has acted unreasonably. Under the now-familiar two prong test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), an agency's interpretation of the statute it administers is entitled to considerable judicial deference. If the agency's interpretation is contrary to the clear intent of Congress, it is invalid. But if Congress has not spoken on the issue, then the court may invalidate the agency's interpretation only if it is "unreasonable" or "impermissible." *Id.* at 844, 104 S.Ct. at

2782. "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). A court may invalidate an agency's construction of its regulations only if it is "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *National Association of Regulatory Utility Commissioners v. FCC*, 746 F.2d 1492, 1502 (D.C.Cir.1984). Thus, when a court invalidates an agency action that is based on the agency's interpretation of its governing statute or its own regulations, the court is in effect finding that the interpretation is, at best, unreasonable. It is difficult to imagine how the court could then find, under the EAJA, that the agency's action (based on the unreasonable interpretation) was nonetheless "slightly more than reasonable."

There may be rare instances in which the agency can show substantial justification in this context, such as when the agency relied upon its own prior interpretations or judicial precedents, or when extenuating factual circumstances motivated its conduct. In our view, however, only in unusual circumstances can a court find that agency action based on the agency's interpretation of its own regulations or governing statute is "substantially justified" if the court has previously overruled that interpretation and found the agency action to be contrary to law.

■ In light of the principles outlined above, we must agree with the district court's determination that the IRS' conduct at the administrative level was not substantially justified. We cannot perceive the reasonableness of the IRS's determination to release otherwise confidential tax information based on notice-and-consent forms that this court found violated the IRS' own regulations and the Internal Revenue Code. Our prior conclusion that the IRS's action was contrary to law precludes the agency from demonstrating that its administrative action was "slightly more than reasonable," unless extraordinary circumstances

are present in the case. The government proffers several reasons as to why the IRS's conduct was nevertheless substantially justified. We reject each of these arguments.

The government expends most of its energy arguing that it was justifiable for the IRS to conclude that the form conformed with the applicable regulations and constituted the knowing and voluntary consent contemplated by subsection 6103(c) of the Code. The IRS cannot meet its burden by re-arguing the merits of the case. This court has already considered the same arguments in a previous decision and, with little difficulty, reached a conclusion adverse to the IRS. Given the deferential standard of review we were obliged to apply, if we had found the IRS' conclusions "reasonable," let alone "slightly more than reasonable," we would not have invalidated the form. *Cf. Keeffe v. Library of Congress*, 777 F.2d 1573, 1578 (D.C.Cir.1985) (noting that a court would not disturb the reasonable judgment of an agency as to the meaning of its own regulations). By definition, that argument fails. Our role is not to decide anew the earlier appeal to this court, but to determine whether the underlying action that the IRS defended there was substantially justified.

The IRS argues, more broadly, that an agency's construction of its own regulation is an insufficient basis to support an award of attorney's fees, even though the court did not agree with the interpretation. A *per se* rule, as thus advocated by the IRS, would insulate a large portion of unlawful agency action from coverage under the EAJA. But it is established that the purpose of the EAJA is to encourage careful agency action and to "foster greater precision, efficiency, and fairness in interpretations of statutes and in the formulation and enforcement of regulations." *Spencer*, 712 F.2d at 550. Those goals would be thwarted if mere citation to an agency's regulatory authority results in a finding of substantial justification even when the court has found that the agency's interpretation is unreasonable or plainly erroneous.

The IRS also argues that its action was reasonable because there was a statutory basis for conditioning Benefits on release of the tax information sought by SSA. In this regard, the government is referring to SSA's authority to discontinue Benefits if a recipient refuses to furnish relevant information requested by SSA. But the issue in this proceeding is the IRS' authority to disclose otherwise confidential information on a flawed taxpayer's consent, not at an agency's request. The IRS cannot demonstrate that its failure to comply with the Code's requirements as to consensual disclosure was slightly more than reasonable due to SSA's authority to request the information of the taxpayer. The Code speaks clearly to the IRS: the agency may never release an individual's tax information to another agency unless it is *explicitly* permitted to do so by a provision of section 6103. The Code does not authorize release of the information at SSA's request and does not recognize SSA's authority to request the information of the taxpayer. By using the forms, SSA was attempting to do indirectly what it could not do directly. It is reasonable for an agency to ignore its own regulations and governing statute only in the most extraordinary circumstances. SSA's frustration with Congress' previous failure to provide for *its* need in the Code did not provide any justification for the IRS' conduct.

Finally, the agency argues that its anticipated reliance on the notice-and-consent forms was justified due to conflicting signals to the IRS emanating from Congress. The Code precluded IRS' disclosure of the information at issue to SSA unless the taxpayer gave her consent pursuant to subsection 6103(c). Yet, the Social Security Act required federal agencies to cooperate with SSA in its efforts to verify the claimed eligibility of Benefits recipients. The IRS contends that the notice-and-consent forms were employed in an effort to reconcile the conflict between these two statutes. But those congressional directives were not necessarily irreconcilable and cannot justify the IRS' conduct. The IRS had the ability and the means to develop a form that conformed to its regulations and that

might have resulted in knowing and voluntary consent. *See Tierney*, 718 F.2d at 456. But the IRS did not develop such a form. Instead, the agency prepared to release confidential tax information based on forms that "[did] not meet the requirements of [its] own regulations" and that made "a mockery of the consent requirement." *Id.* at 455, 456. The IRS thereby sought to precipitate the statutory authorization Congress subsequently provided to meet the enforcement needs of SSA. The IRS thus failed to exercise the care that Congress sought to encourage when enacting the EAJA.

In sum, we hold that the IRS has failed to show that it was substantially justified in preparing to release tax information pursuant to consent forms that violated its own regulatory requirements and the Code. Because we find that the government's underlying action was not substantially justified, we need not reach the issue of whether its litigating position was substantially justified.

### C. *"Special Circumstances"*

■ The EAJA provides that even if the court concludes that the government's position was not substantially justified, the court should nevertheless refuse to award attorney's fees if "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The "special circumstances" provision is a "safety valve" designed to "insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts" and to protect the court's discretion to rely on "equitable considerations" in denying a fee award. H.R.Rep. No. 96–1418 at 11, 1980 U.S.Code Cong. & Ad.News at 4953, 4990. As with the substantial justification provision, the government has the burden of demonstrating the existence of special circumstances that would render an award unjust.

■ The district court did not specifically respond to the IRS' special circumstances arguments. In a similar context, this court recently remanded an attorney's fees case to the district court for its evaluation of whether special circumstances existed because the lower court had "never provided any reasoned explanation for its implicit rejection of the argument." *Grano v. Barry*, 783 F.2d 1104, 1112 (D.C.Cir.1986) (involving the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988). However, we added:

> Our holding today does not mean that district courts have an affirmative duty in each and every case to set forth reasoning on the special circumstances issue. But in a case where a major part of the defendant's argument focuses on that issue, a district court should set forth its reasoning for concluding that special circumstances do not exist.

*Id.* This is not such a case. The IRS focused very little of its argument on the special circumstances doctrine. *Compare Grano*, 783 F.2d at 1111. In fact, for the most part, the IRS simply reiterated its substantial justification arguments. We therefore conclude that the district court did not err in failing to spell out its rejection of the IRS' special circumstances argument. Moreover, nothing would be gained in this case by remanding for the district court's further consideration. The district court does not have a "superior understanding" of the circumstances of the litigation; this court is the only court that has addressed the merits of the underlying dispute. *Compare id.* at 1112.

■ The government contends that its action was precisely the sort of novel interpretation of the law underlying enforcement efforts that Congress contemplated in enacting the special circumstances exception to the EAJA. The IRS asserts that this litigation arose from a creative, but well-grounded, attempt by the government to comply with its statutory obligations under the Social Security Act and its general obligation of fiscal responsibility. As we noted in our previous opinion in this case, Congress has given "conflicting signals" to SSA. *Tierney*, 718 F.2d at 454. On the one hand, Congress has mandated that SSA determine applicants' eligibility from sources other than the applicants' own

statements; on the other hand, Congress failed to provide in the Code for the release of the information that SSA now seeks. We observed that "[w]hen Congress speaks with two separate minds, the conflicting goals can present difficult dilemmas." *Id.*

The IRS argues that "[g]iven what was an obvious oversight by Congress in enacting Section 6103 of the Internal Revenue Code, attempting to use the consent forms was the only practical solution to a rather significant problem." Although we do not necessarily agree that the omission was the result of congressional "oversight," we have no quarrel with the government's interest in resolving the apparent dilemma. We are not condemning the government's motives; we are condemning the means that the government chose to reach its intended goal. It is not, nor has it ever been, acceptable for agencies to attempt to solve problems Congress has created by taking action that contravenes their own governing statutes. Congress writes the laws; the agencies must apply them as they are written and not as they should have been written in a perfectly coordinated legislative world. If a statute falls short of providing desireable or necessary provisions, "that is a problem for Congress, and not the [agency] or the courts, to address." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986); *see Independent Community Bankers Association of South Dakota, Inc. v. Board of Governors of the Federal Reserve System,* 820 F.2d 428, 440 (D.C.Cir.1987). The IRS can draw no support from the fact that Congress eventually amended the Code specifically to provide for release to SSA of the information that SSA attempted to secure through the use of the notice-and-consent forms. By amending the Code, Congress may have shown its agreement "that the exchange of information was [a] legitimate law enforcement effort," as the IRS contends. But Congress' subsequent enactment of amendments which allowed pursuit of the IRS' goals is not a sanction for the means the agency employed. If anything, the legislative action highlights the fact that the unrevised Code did *not* provide for the disclosure that the IRS was prepared to afford SSA here.

The IRS' other arguments merit little discussion. The IRS contends that two equitable considerations make the granting of attorney's fees in this case especially unjust. First, the IRS complains that SSA was the principal agency involved in designing the forms and since the district court denied the application for the award of attorney's fees in the case against SSA, it would be "rather harsh" to impose fees on the IRS. As an initial point, the court denied the fee application against the SSA, in part, because it found that plaintiffs were not the "prevailing party" in that case. In addition, the proceeding was resolved prior to the 1985 Amendments; therefore, the court found only that SSA's litigating position was substantially justified and SSA litigated solely on jurisdictional grounds. *See Tierney v. Heckler,* Civ. Action No. 82–1638 (D.D.C. March 28, 1984) [Available on WESTLAW, DCT database]. More important, in this case we are addressing the IRS' role concerning the consent form. We find nothing harsh about holding the IRS accountable for its part in the action, even if SSA avoided similar responsibility.

Second, the IRS asserts that if the district court had resolved the application more quickly, the 1985 Amendments would not have been an issue in this case. Appellees filed their fees application in February of 1984, but the court did not consider the application until October of 1985. Had the district court acted before August 5, 1985, *Spencer* would have been controlling and the court would have examined only the agency's litigating position. The IRS implies that the court would have found the agency's litigating position substantially justified. This argument is both presumptuous and irrelevant. Even assuming the IRS' hypothesis is correct, we fail to see how equity demands that the IRS now get the benefit of this court's reading of the EAJA prior to the clear interpretation enunciated by Congress in its 1985 Amendments to the statute.

In sum, we conclude that the IRS has not demonstrated special circumstances that would make a fee award unjust in this case.

CONCLUSION

At the time the IRS was preparing to release confidential tax information, it was acting under a statute and regulations that plainly proscribed such action. There were no facts extant which would have made such action tolerable; indeed, the ultimate solution to the enforcement needs of SSA was achieved by Congress in amending the Internal Revenue Code. Until Congress authorized such action, the IRS' administrative position in participating in the drafting of the notice-and-consent forms and in preparing to release otherwise confidential tax information to SSA pursuant to the forms in contravention of its regulations and the Code was not substantially justified. There are no special circumstances that counsel against awarding fees to appellees, the prevailing party in the civil suit underlying the instant fees proceeding. The district court therefore correctly awarded fees and costs to appellees under the EAJA. We affirm the judgment below.

*It is so ordered.*

SILBERMAN, Circuit Judge, dissenting:

The majority, in my view, interprets EAJA's "substantially justified" test to create what we previously decided in *Federal Election Commission v. Rose*, 806 F.2d 1081 (D.C.Cir.1986), is precisely what Congress did not intend—an automatic fee-shifting statute. The majority opinion makes the government presumptively liable for legal fees under EAJA whenever its interpretation of a statute or regulation is ultimately rejected by a court as "contrary to law." The *Rose* case adopted a very different approach for those situations where the government's position is rejected as "arbitrary and capricious." There we observed that despite the seemingly incongruity of language, it was perfectly possible for the government's position to be both arbitrary and capricious and still substantially justified (or reasonable) within

the meaning of the EAJA. Thus, *Rose* requires us to carefully consider whether the government's administrative position was reasonable despite having been found legally defective. *See id.* at 1089. "Congress' inclusion of the discrete legal standard [substantially justified] makes clear that an independent evaluation through an EAJA perspective is required." *Id.* at 1087. The majority rejects that approach for cases involving the government's interpretation of statutes and regulations, concluding that since our governing scope of review requires that we defer to an agency's reasonable interpretation, our declaring the agency's position "contrary to law" necessarily means that the agency's position was unreasonable, and thus perforce not substantially justified under EAJA. Since I believe the majority opinion is a victory of semantics over logic and congressional intent, I respectfully dissent.

Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), our deference is not to an agency's reasonable administrative position but rather to its reasonable interpretation of a statute. In that latter sense, "reasonable"—like "arbitrary and capricious," *see Rose*, 806 F.2d at 1087—is a legal term of art; it recognizes that the agency has been delegated authority to fill in legislative interstices and resolve statutory ambiguities, but only within a circle of general legislative intent that the courts will draw. Even judges—presumably reasonable judges—often disagree as to whether an agency's interpretation of the statute is, under *Chevron*, a reasonable one. Yet under the majority's view, no matter how close the question, if we decide against the government in this kind of case, EAJA requires that fees be awarded. Presumably, then, if ten other circuit courts affirmed the government's interpretation but we—by, say, two to one—disagreed with the government's administrative position, it, as a matter of law, would not be substantially justified. I think that hypothetical alone shows that the majority's interpretation of "substan-

tially justified" is, to turn the blade, "unreasonable."

Moreover, I do not think there is anywhere near as sharp a distinction as the majority perceives between those administrative law cases in which the government's conduct is deemed "arbitrary and capricious" and those in which it is deemed "contrary to law." In most cases, the petitioner challenging the government's position makes both arguments, and those arguments often run together. Indeed, our opinions often fail to clearly distinguish between the two. When we remand to an agency because that agency "arbitrarily and capriciously" failed to provide an adequate explanation of its decision, we really have not passed upon the merits of the agency's position. *See Rose*, 806 F.2d at 1088. But when, for example, we reject an agency's position because it insufficiently considered a relevant factor, our decision invariably rests on a judicial interpretation of the governing statute that explicitly or implicitly differs from that of the government. *See, e.g., City of New York v. FCC*, 814 F.2d 720, 726–28 (D.C.Cir.1987). Although we may call the government's position in such a case "arbitrary and capricious," we are implicitly also calling it "contrary to law." Thus, the majority opinion places more burden on the distinction between these concepts than administrative law and judicial decisionmaking will bear. Under the majority's rule, future awards of attorney's fees may well depend on almost capricious judicial labeling.

In truth, there are analytically only two postures—no matter what words are used to express them—for courts to take in determining whether the government's position is substantially justified.[1] One is to say—as the majority does in this case—that if the government loses on the merits,

it fails the test. The other is for the court to ask itself whether the case presents a close question. Would reasonable lawyers divide over the likely result? We adopted the latter approach in *Rose* when we described, as an example of a case where fees should be paid, an instance where "an agency [fails] to apply a rule in a situation to which the rule *obviously* pertains." 806 F.2d at 1089 (emphasis added). The majority rejects that approach here, describing it as "a mere penalty box for gross misconduct." Maj. Op. at 101.

"Gross misconduct" is hyperbole, but it seems to me that as between the two positions described above, Congress did intend us to use EAJA as a penalty box rather than as a vehicle for automatic fee-shifting. *See Rose*, 806 F.2d at 1087 & n. 13, 1090. We, however, have chosen to use it for *both* purposes, and have relied upon imprecise terminology to identify categories of cases where one or the other test should apply. In so doing, we have made hash of the statute.

Because I believe the main case, *Tierney v. Schweiker*, 718 F.2d 449 (D.C.Cir.1983), was, notwithstanding some fierce judicial language, very close, I would hold that the government's position was substantially justified.[2]

---

1. Ever since *Spencer v. NLRB*, 712 F.2d 539 (D.C.Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984), we have required the government to show that its litigating position was "slightly more" than reasonable. I, however, do not believe that we judges—or, for that matter, anyone else—can identify or imagine a government position that would pass a reasonableness threshold but fail *Spencer's*. Indeed, in *Spencer*, the opinion used "reasonable"

and "slightly more than reasonable" interchangeably. *See Battles Farm Co. v. Pierce*, 806 F.2d 1098, 1101 n. 11 (D.C.Cir.1986).

2. Alternatively, I would hold that "special circumstances" justified the government's position. If that statutory phrase has any meaning at all, it should apply here.