**NATIONAL LAW CENTER ON HOMELESSNESS AND POVERTY, et al.,**
Plaintiffs,

and

**National Union of the Homeless, et al., Intervenors,**

v.

**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, et al., Defendants.**

Civ. A. No. 88–2503–OG.

United States District Court,
District of Columbia.

July 28, 1992.

L. Jeffrey Pash, Jonathan T. Foot, Covington & Burling, Maria Foscarinis, Washington, D.C., for plaintiffs.

Carlotta P. Wells, Felix V. Baxter, Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, for defendants.

## MEMORANDUM

GASCH, Senior District Judge.

On July 1, 1991, plaintiffs petitioned the Court for an award of attorneys' fees, pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, in connection with their work on five issues in this case,

namely: 1) plaintiffs' motion for a further order enforcing the permanent injunction of December 12, 1988, filed July 12, 1990, heard by the Court on September 21, 1990, and granted in part on February 13, 1991; 2) a status conference related in part to that motion, held on January 3, 1991; 3) proceedings related to defendants' motion to alter or amend the Court's order of February 13, 1991, which was denied on May 2, 1991; 4) plaintiffs' motion for an order compelling publication of regulations which was made and granted at a hearing on April 26, 1991; and 5) preparation of the present fee petition. Defendants moved for a stay of consideration of plaintiffs' petition which the Court denied on February 11, 1992.

In addition, plaintiffs have petitioned for an award of attorneys' fees and expenses incurred in connection with defendants' appeal of the aforementioned orders. The Court considers both fee petitions at this time.

## BACKGROUND

This case is about the duties of the United States under a statute known as Title V of the Stewart B. McKinney Homeless Assistance Act (the "McKinney Act"), 42 U.S.C. § 11301 et seq., § 11411 et seq. Upon granting plaintiffs' motion for summary judgment, the Court, on December 12, 1988, issued a permanent injunction granting most of the relief plaintiffs requested. See National Coalition for Homeless v. United States Veterans Admin., 695 F.Supp. 1226 (D.D.C.1988) (preliminary injunction); National Coalition for Homeless v. United States Veterans Admin., Civ. A. No. 88–2503–OG, 1988 WL 136958 (D.D.C. Dec. 15, 1988) (permanent injunction).[1] Essentially, defendants had unreasonably delayed compliance with Title V of the McKinney Act. That order was not appealed.

On April 29, 1989, plaintiffs moved for an order enforcing the permanent injunction because the Department of Health and

1. The United States Veterans Administration was elevated to a cabinet level department effective March 15, 1989, and was renamed the United States Department of Veterans Affairs. 38 U.S.C. § 301 et seq.

Human Services ("HHS") had a practice of refusing to accept applications for property determined by the Department of Housing and Urban Development ("HUD") to be suitable for use by the homeless, unless the property had first been declared to be "excess" by the landholding agency. An order granting the motion, filed May 22, 1989, was also not appealed.

However, plaintiffs subsequently moved for a second order enforcing the permanent injunction on July 12, 1990, the subject of the current fee litigation. Argument was heard after full briefing on September 21, 1990. Broadly speaking, the issues were: a) how HUD was to canvass landholding agencies, both in content and frequency; b) whether defendants had placed unreasonable burdens on McKinney Act applicants with regard to an environmental questionnaire; c) whether defendants had instituted a meaningful outreach program to applicants; and d) whether a statement of intent to apply for funding under Title IV of the McKinney Act was alone sufficient to demonstrate funding for purposes of application for housing under Title V.

While the Court was considering the motion argued on September 21, 1990, Congress amended the McKinney Act with the Stewart B. McKinney Homeless Assistance Amendments Act of 1990 ("Amendments Act"), on November 29, 1990. A status conference was held on January 3, 1991, to determine what, if any, impact the Amendments Act had on the motion at bar. It was agreed by the parties at that conference that the amendments did not affect the motion for further enforcement of the permanent injunction. The Court then granted, in part, plaintiffs' motion to further enforce the permanent injunction on February 13, 1991. *See National Law Center on Homelessness & Poverty v.*

*United States Veterans Admin.,* 765 F.Supp. 1 (D.D.C.1991).

Defendants moved to alter or amend the Court's order of February 13, 1991. This was denied on May 2, 1991. *Id.* at 13–14. The February 13, 1991, and May 2, 1991, orders were appealed. In the time between these two orders, plaintiffs moved for an order compelling publication of regulations concerning implementation of the McKinney Act. That motion was granted at a hearing on April 26, 1991. The original fee petition was filed on July 1, 1991. The Court of Appeals affirmed this Court's opinions of February 13, 1991 and May 2, 1991, on May 29, 1992. *National Law Center on Homelessness & Poverty v. United States Dept. of Veterans Affairs,* 964 F.2d 1210 (D.C.Cir.). A petition for an award of fees and expenses in connection with the appeal was filed on July 8, 1992.

## DISCUSSION

### I. Applicable Law

█ Under the Equal Access to Justice Act, to be entitled to an award of attorneys' fees, the petitioner (a private litigant) must bear the burden of proving that he is a "prevailing party" against the government. Defendants fairly concede that plaintiffs are, in fact, prevailing parties on some issues that were the bases for the underlying enforcement action.[2]

█ However, once plaintiffs have proven that they are prevailing parties, the burden shifts to the government. Defendants then have the opportunity of proving that their position was "substantially justified," on both the agency's underlying action which gave rise to the litigation, and with respect to the government's litigation position. These are separate inquiries. *Jones v. Lujan,* 887 F.2d 1096, 1098 (D.C.Cir.1989). If defendants can carry

**2.** On the other hand, plaintiffs did not win on each issue presented in their motion for a further order enforcing the permanent injunction, and, therefore, should not be considered "prevailing parties" on all issues. Of course, the question of how many issues on which a party can be said to have prevailed does not go to *whether* there will be a fee award, but rather to *how much* the fee award will be. *See Hensley v.*

*Eckerhart,* 461 U.S. 424, 428, 103 S.Ct. 1933, 1936, 76 L.Ed.2d 40 (1983) (party need not have succeeded on every claim to be considered a "prevailing party"); *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) (fee award of some kind should follow if party succeeds on any significant issue in litigation achieving some benefit sought in bringing suit).

these burdens for any of the issues on which plaintiffs can be said to have prevailed and for which they seek fees, no fees should be awarded with respect to those issues. Since the Court finds it difficult to separate issues on which the government was substantially justified, and since a mathematical division is neither practical nor favored, the fee award will be reduced on an equitable basis to reflect the extent to which the Court believes the government bore its burden.[3] *See supra* note 2.

It is not the purpose of the EAJA to relitigate issues that have already been decided. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. However, a separate analysis as outlined above must be undertaken. Plaintiffs won some of their motions. That fact is not now in dispute, nor are the merits of those motions. The crucial question is whether the government's position was substantially justified, that is, justified in substance or in the main, justified to a degree that would satisfy a reasonable person. *Pierce v. Underwood,* 487 U.S. 552, 563–68, 108 S.Ct. 2541, 2549–52, 101 L.Ed.2d 490 (1988). There need only be a reasonable basis in law and fact for the government's position to be substantially justified.[4] *Id.* at 566 n. 2, 108 S.Ct. at 2550 n. 2.

Before addressing the questions of whether defendants were substantially justified in their underlying agency actions and in their litigation position, a fundamental misunderstanding of the applicable law needs to be ironed out.

■ Plaintiffs cite *Abel Converting, Inc. v. United States,* 695 F.Supp. 574, 577–78 (D.D.C.1988), which in turn relies on *Tra-*

*han v. Regan,* 824 F.2d 96, 102 (D.C.Cir. 1987), for the proposition that, "when the [agency] conduct is determined to be 'contrary to law, the government will rarely be able to demonstrate that its administrative action is substantially justified.' " Plaintiffs' Reply Memorandum at 2. While the *Abel Converting* decision was correctly decided, given the law of this Circuit at the time, it is quite clear that two weeks after it was decided, the Court of Appeals *en banc* vacated both the panel opinion, *Trahan v. Regan,* 824 F.2d 96 (D.C.Cir.1987), and the district court opinion, 625 F.Supp. 1163 (D.D.C.1985). *Trahan v. Regan,* 866 F.2d 1424 (D.C.Cir.1988) (en banc). *Pierce v. Underwood, supra,* was decided by the Supreme Court on June 27, 1988. The Court of Appeals was simply remanding *Trahan* in light of the new standard of reasonableness articulated in *Pierce* which overruled the District of Columbia Circuit's standard of "slightly more" than reasonableness announced in *Spencer v. NLRB,* 712 F.2d 539, 558 (D.C.Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984).

The *Abel Converting* decision did, interestingly enough, take the holding in *Pierce* into account. In a rather bold footnote, this Court said: "Surviving equally well after the *Pierce* decision, however, is the more specific analysis in *Trahan* that government action contrary to law will only rarely be substantially justified." *Abel Converting,* 695 F.Supp. at 577 n. 3 (citing *Trahan,* 824 F.2d at 102). With *Trahan* having been vacated in the wake of *Pierce,* the fate of this assertion was undetermined. After the remand of *Trahan* for a

---

**3.** By this finding the Court in no way envisions that more precise attorney time records (*i.e.,* time records that would indicate amounts of time spent on each issue and subissue) would have been helpful in arriving at a fair award in this case. The Court believes that attorneys, by and large, spend enough time on detailed billing that any further detail would be wasteful and burdensome. Furthermore, it would be burdensome for the Court to enforce a rule that would require judges to wade through time sheets and pick out issues and subissues as labeled by the attorneys when keeping records of their time. There are no guarantees that such labels are correct either in the terms used to denote cer-

tain issues or in the accuracy with which time records are generally kept. *See Naekel v. Dept. of Transp., Federal Aviation Admin.,* 884 F.2d 1378 (Fed.Cir.1989) (citing *Hensley v. Eckerhart,* 461 U.S. at 435 n. 11, 103 S.Ct. at 1940 n. 11 (rejecting mathematical division of issues, emphasizing result and reasonable expenditure of time)).

**4.** *Pierce* also held that an abuse-of-discretion standard of review applies to district court determinations of attorney fee petitions; they are not reviewed *de novo. Pierce v. Underwood,* 487 U.S. at 557–63, 108 S.Ct. at 2545–49.

fresh evaluation of the fee petition, in the subsequent affirmance, Judge Sentelle wrote: "Undoubtedly, there will be instances in which an agency might take a position about its own statute or regulation, which, while incorrect, might appear correct to a reasonable person." *Trahan v. Brady,* 907 F.2d 1215, 1220 (D.C.Cir.1990). He distinguished between "patently unreasonable agency action" and "mere failure to conform to their own statutes and regulations." *Id.*

In *Spencer v. NLRB,* the Court of Appeals wrote: "[T]he more clearly established are the governing norms, and the more clearly they dictate a result in favor of the private litigant, the less 'justified' it is for the government to pursue or persist in litigation." *Spencer v. NLRB,* 712 F.2d at 559. Whether this is still the law in light of *Pierce* and all the holdings in *Trahan* is, at a minimum, questionable. After *Pierce,* justification for agency action and related litigation is now merely a reasonableness inquiry. Whether agency action was contrary to law or not is no longer the main question. Whether the agency action was contrary to law may only help inform the court of the reasonableness of the action and the litigation position.

## II. *Justification of Underlying Agency Action*

Now that the standards are plain, the Court should go about the business of deciding whether the actions of the various agencies involved in this case, those which gave rise to the enforcement proceedings and defendants' motion to alter or amend, were substantially justified. To do this, it is best to go through what plaintiffs asked for, what they got, and what defendants' reasons were for disagreement and litigation. If an agency's position was such that a reasonable person might have thought it correct, then it must be said that the government was substantially justified. *Trahan v. Brady,* 907 F.2d at 1220. It is best to go agency by agency.

## A. HUD

█ In their motion for an order further enforcing the permanent injunction of December 12, 1988, plaintiffs sought an order directing HUD to: 1) conduct its canvass of *all* properties surveyed as unutilized, underutilized, excess or surplus *each quarter,* not simply a survey of all properties once a year with quarterly updates of any changes; 2) deliver suitability determinations within 72 hours of the determination being made; 3) publish lists of properties both suitable and available in the *Federal Register;* and 4) revise its canvass letter to include excess and surplus properties in addition to unutilized and underutilized properties, and make it clear that HUD alone, not landholding agencies, would make suitability determinations. Numbers 1) and 4) above were granted; 2) and 3) were denied.

With respect to numbers 1) and 4), HUD's reasons for its actions are fairly clear.[5] The permanent injunction of December 12, 1988 says:

HUD shall canvass all land-holding agencies quarterly to collect information about unused or underused federal property. HUD's canvass shall include, but not be limited to, collection of information regarding all property declared excess or surplus and all properties declared unutilized or underutilized in surveys made pursuant to 40 U.S.C. § 483(b) and 41 C.F.R. § 101–47.802(a) or Executive Order 12512 and 41 C.F.R. § 101–47.802(b).

Order of December 12, 1988, ¶ (B)(2).

Since the Federal Property and Administrative Services Act of 1949 ("FPASA") was cited by the Court, HUD reasoned that its practice of collecting information under FPASA was the preferred method of survey envisioned by the Court, namely, to conduct a survey of *all* federal properties reported as unutilized, underutilized, excess and surplus once each year, and then have quarterly updates which would in-

---

**5.** We need not address HUD's reasons for 2) and 3) as plaintiffs were not "prevailing parties" under EAJA for those issues.

**154**

clude any property with a status different from that which was reported, along with any properties which were not reported for whatever reason. Since this was the accepted and well-known practice under FPASA, and since FPASA was cited in the Court's permanent injunction, it was at least reasonable for HUD (the government) to think that one survey ("comprehensive canvass")[6] and three quarterly updates were contemplated by the Court.

It should also be noted that one of two main reasons[7] why the government appealed this Court's February 13 and May 2, 1991 orders is the fact that, as a practical matter, it is virtually impossible for defendants to compile availability determinations on the various properties while expending time and resources to re-report each property every 90 days. Such constant reporting leaves properties in a virtually constant "freeze," which the government alleges makes it very difficult for it to dispose of properties in which there is no interest by providers to the homeless.[8]

Of course, it has been argued that the government is hiding behind its duties under FPASA in an effort to avoid compliance with the McKinney Act. While that may have been the case with the motions which are relevant to this current fee petition, the issue of reporting on *all* properties every 90 days versus an update on all *changed* properties every 90 days is not the issue on which to determine bad faith or lack of reasonableness on the part of the government.

The second issue with respect to HUD is the question of whether the content of the canvass letter should have been modified to ask landholding agencies to report "excess" and "surplus" properties, and whether the letter should have specifically stated that HUD, and HUD alone, would make suitability determinations.

HUD's canvass letter did not ask landholding agencies to report excess and surplus properties for a very good, and at least legitimate, reason: "[L]andholding agencies, with the exception of GSA (General Services Administration), do not hold excess and surplus properties." Defendants' Response, filed September 5, 1990, at 13. For its part, GSA would have reported all excess and surplus property for suitability determinations to HUD pursuant to its obligations under this Court's permanent injunction, regardless of the wording of the canvass letter. *See* Declaration of James N. Forsberg, filed September 5, 1990, ¶ 4. HUD's main reason for leaving excess and surplus properties out of the canvass letter was that the terms "unutilized" and "underutilized," as they have been used, necessarily encompass the definitions of the terms "excess" and "surplus." All "unutilized" and "underutilized" properties are reported to HUD *before* they become "excess" or "surplus" and assigned to GSA.

Finally, the canvass letter did not state that HUD, and HUD alone, would make suitability determinations. It had been HUD's practice to monitor closely the responses which landholding agencies submitted to make sure that the landholding agencies were not conducting suitability determinations. In the rare event that there was a mistake and a landholding agency did, in fact, make a suitability determination, it was HUD's practice to contact that agency and determine if it was the agency's intention to make a suitability determination when that was not its duty. Any agency ignorance of its duties may be linked to the wording of the canvass letter,

---

**6.** The term "comprehensive canvass" is a bit of a misnomer insofar as it implies that only one of the four surveys conducted, as HUD had viewed it, was "complete" or "accurate," while the other three were not. In fact, the three quarterly "updates" were just as complete and accurate as the comprehensive canvass; they simply did not re-report any property whose status had not changed since the filing of the comprehensive canvass (or "annual survey").

**7.** The other main reason for defendants' appeal concerned whether nothing more than a statement of intent to apply for funding under Title IV should suffice as a demonstration of adequate funding under Title V.

**8.** Indeed, many properties that the government claims it is being hindered from selling or otherwise disposing of are totally unsuitable for any kind of use to benefit the homeless.

but it was reasonable for HUD to assume that its practices of supervising the landholding agencies to be sure that they did not make suitability determinations would obviate the need to include such language in their canvass letter.

## B. HHS

█ Plaintiffs asked the Court to: 1) discard the environmental questionnaire used by HHS during leasing and permitting activities under Title V; 2) abandon environmental reviews in connection with Title V leasing activities; 3) order HHS to develop criteria for a categorical exclusion from the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47, for leasing or permitting activities; 4) declare these activities "emergencies" and therefore exempted from the requirements of NEPA; and 5) declare that a statement of intent to apply for funding under Title IV would alone constitute a demonstration of funding required for application under Title V.

Plaintiffs were only successful in convincing the Court concerning number 5) above. The Court determined that intent to apply for funding under Title IV was sufficient for a housing application under Title V. If funding was not ultimately available to the applicant after a reasonable period of time, under the Court's order of February 13, 1991, defendants were not then required to sign leases for properties without assurances of proper funding for projects.

Defendants argued that HHS has duties under Title V and FPASA which forbid them from leasing or deeding property unless applicants can demonstrate that they are able to fund their program and immediately provide adequate insurance and property maintenance for the property. Quite so, but here defendants' position is much weaker. The government was mistaken when it translated an *application* for housing into a full-blown lease or a deed. The import of this Court's ruling on February 13, 1991, was that an applicant seeking to provide housing to the homeless could get the application process moving under Title

V with a mere statement of intent to apply for Title IV funding. Then, given the speculative nature and scarcity of Title IV funding, the provider could use the processing time to find other sources of funding for the proposed project.

The government's position would be substantially justified only if a reasonable person would have thought it correct that HHS would be: 1) obligated to approve a Title V application, or request assignment of property from GSA without adequate assurance of proper funding, or 2) obligated to sign any lease or deed for any property with an applicant seeking to provide housing to the homeless simply because an applicant had applied for housing under Title V and funding under Title IV.

The language of HHS's obligation under 45 C.F.R. part 12 is of "leasing" and "deeding," not "applying" or "considering." The Court, by its order of February 13, 1991, directed defendant HHS to interpret its regulations and conclude that it was not prohibited from accepting and considering applications for housing under Title V, without a more adequate demonstration of funding than an intention to apply for Title IV funds. The Court finds that HHS's reading was, in fact, unreasonable.

## C. GSA

Plaintiffs sought to have GSA barred from any involvement in the process of assigning properties to HHS and from the consideration of extensions of time for applicants to submit their completed applications. The Court denied both of these requests. The government was, therefore, substantially justified. Furthermore, while the Court did admonish GSA for its contributions to an isolated assignment with respect to some Veterans Administration property in Arkansas, such a criticism does not rise to give plaintiffs "prevailing party" status on this issue.

## D. Meaningful Outreach and Continuous Monitoring

█ In addition to each of the requests made with respect to the several agencies mentioned above, plaintiffs made two blan-

ket requests which were directed to defendants generally. The first was a request that the Court order defendants to submit to the Court for approval a plan of meaningful and appropriate outreach to homeless providers with respect to the McKinney Act. The second was a request to have defendants include six additional types of information in their monthly reports to the Court on their compliance with the permanent injunction. Plaintiffs wanted: 1) copies of all canvassing letters sent during each month along with addresses and dates; 2) copies of all responses to canvassing letters and dates received; 3) copies of all notifications from HUD regarding suitability of property reported to it including addresses and dates; 4) copies of all determinations made by landholding agencies pursuant to section 501(b) of the McKinney Act and dates of those determinations; 5) copies of all letters of intent submitted to HHS by homeless providers; and 6) copies of all requests for extensions of time submitted to HHS and any responses to those requests.

As to the meaningful outreach, the Court agreed with plaintiffs that there was not a program of meaningful outreach to homeless providers. Memorandum of February 13, 1991, at 25. However, the Court did not grant plaintiffs' request that the Court order defendants to submit to the Court a plan of reformed outreach. The Court left it up to defendants to develop a plan to satisfy the McKinney Act's requirement of direct information provided to homeless providers about properties available in their localities. *Id.* at 26. The Court finds that plaintiffs did not win a "real world benefit" with this ruling.

As to continuous monitoring via the monthly reports, the Court denied all six of plaintiffs' requests for additional information to be provided. *Id.* at 27. The Court found that such requirements would be unduly burdensome to the defendants. Plaintiffs were definitely not prevailing parties on the modification of the monthly reports issues.

### III. *Justification of Litigation Position*

An EAJA fee analysis is bifurcated to determine whether both the underlying agency actions which formed the bases for plaintiffs' motions, and the government's litigation positions were substantially justified, that is to say, reasonable in law and fact.

Unfortunately, *Jones v. Lujan*, 887 F.2d at 1097–98, is not very illuminating on the subject of how such a bifurcated analysis is supposed to work. The EAJA refers to the "position of the United States" which must be substantially justified. "[P]osition of the United States" *had* been read to mean only the government's litigation position in *Spencer v. NLRB*, 712 F.2d at 546–57. However, after the 1985 amendments to the EAJA, the definition of "position of the United States" is clearly stated to mean, "in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D) (Supp. V 1987).

In a rather simplistic tone reminiscent of the playground, there needs to be a good reason for the action, and a good reason for fighting about it. Generally, though, the two go hand in hand, so to speak. Only in a case where the government can be said to be "unreasonable" in maintaining a suit, for example, if the sole reason for litigating was the desire to beat a particular plaintiff's attorney, would the Court be able to bifurcate the litigation position from the underlying agency action.

With respect to the canvass letter and whether or not it should have included the terms "excess" and "surplus," and whether it should have clearly stated that HUD, and HUD alone, would make suitability determinations, it should be noted that the government adopted a rather conciliatory stance which made it clear to plaintiffs that changes in the canvass letter would not cause defendants a problem if such changes would make the letter clearer. As the analysis above shows, the government had reasons for leaving certain things out of the canvass letter, but in a posture to be helpful to plaintiffs, defendants were will-

ing to amend their letter. The better question is whether plaintiffs were forced to litigate about changes to a canvass letter which are so easily made and unobjectionable. The Court concludes that resort to litigation on the content of the canvass letter was not necessary.

## IV. *Size of the Award*

With respect to each of the issues which the Court considered during plaintiffs' motion to further enforce the permanent injunction, and the related subsequent litigation, the Court finds that while the government was substantially justified on several key issues, plaintiffs did win some of the relief which they sought by bringing their motion. Accordingly, the Court now decides how much to award plaintiffs in fees and costs.

Plaintiffs' original petition is for 381 hours of attorney time at the reasonable rate of $112.51 [9] for five different attorneys. This rate is in excess of the $75.00 statutory cap imposed by EAJA because of increases in the cost of living as measured by the Consumer Price Index ("CPI"). 28 U.S.C. § 2412(d)(2)(A)(ii); *Abel Converting, Inc. v. United States,* 695 F.Supp. at 579–80. Fees are also sought for 131 hours for a legal assistant at $60.00 per hour. Finally, $1,200.00 is sought for duplicating costs. The total sought for the enforcement motions in fees and costs is $51,926.31.

It is well settled that the EAJA contemplates recovery of fees for "all phases of successful civil litigation addressed by the statute." *Commissioner, INS v. Jean,* 496 U.S. 154, 166, 110 S.Ct. 2316, 2323, 110 L.Ed.2d 134 (1990); *Jones v. Lujan,* 887 F.2d at 1097. In connection with the appeal, plaintiffs seek fees for 134.5 hours of attorney time at $115.87 per hour.[10] They

---

9. *See infra* note 10.

10. Plaintiffs have submitted detailed documentation about the CPI to support their petition for an increased rate of $115.87 per hour applicable to work performed in March 1992. Exhibit D of Plaintiffs' Supplemental Memorandum in Support of Award of Attorneys' Fees and Expenses on Appeal, filed July 8, 1992, indicates that there has been a 20.7% increase in the CPI since the *Abel Converting* decision, *supra,* used a $96.00 per hour rate in November 1987. As explained in *Wilkett v. Interstate Commerce Comm'n,* 844 F.2d 867, 874–75 (D.C.Cir.1988), the cost of living adjustments should be based on October 1981, the month that the EAJA became effective, not subsequent cases, as plaintiffs suggest. *Id.* The CPI–U (all urban consumers), as calculated and published monthly by the Bureau of Labor Statistics, U.S. Department of Labor, should be used, not the CPI for the Washington D.C. area which is only published every other month, and less often in most other American cities with a population of 200,-000 or more. *Contra id.* at 875; *Hirschey v. Federal Energy Regulatory Comm'n,* 777 F.2d 1, 5 n. 24 (D.C.Cir.1985).

The proper percentage increase between October 1981, the effective date of the EAJA, and June 1992, the most current available statistic, is 46.8 (June 1992 [140.2] minus October 1981 [93.4] equals [46.8]). The percentage increase in the CPI–U is 46.8 divided by 93.4, or .5011 times 100 equals 50.11%. The EAJA statutory maximum of $75.00 times the percentage increase (.5011) equals $37.58, rounded to the nearest cent. The applicable statutory maximum hourly rate for attorneys' fees as of June 1992, then, is $75.00 plus $37.58, or $112.58.

The Court recognizes that unusual delay can be a "special factor" under the EAJA to increase the maximum rate allowable for an award of attorneys' fees. *Hirschey,* 777 F.2d at 5. The Court has been disappointed, to say the least, and at times appalled, by the government's delay and reluctance to come to grips with its responsibilities under the McKinney Act. However, the Court must focus on the issue at hand, and the delay with respect to fees since plaintiffs' original petition was filed on July 1, 1991, has been due to a motion to stay consideration of plaintiffs' petition made by defendants, and by the normal delays attendant to the administration of justice. The delay with respect to fees has not been "special" or unusual, regardless its cause, to support an upward adjustment.

The Court is reluctant to apply two different hourly rates (one applicable for the petition filed in July 1991, and another in July 1992) in this opinion because of the obvious and burdensome line drawing problems inherent with the calculations of when legal work was performed. The only sensible rule is to apply the more recent of the two rates for all hours awarded, thus providing during periods of inflation, an engine to settlement, albeit a small one in this case. The government will suffer the delays of appeals, as here, during inflationary times, and only benefit, appropriately enough, in periods of deflation.

The Court notes that the approach adopted above is the law in this Circuit, though for different reasons. *Id.; Massachusetts Fair Share v. Law Enforcement Assistance Admin.,* 776 F.2d 1066, 1069 (D.C.Cir.1985). *See Wilkett,* 844 F.2d at 875, n. 4. The court in *Hirschey* adopted the current statutory maximum rate as

**158**

also seek 1.75 hours for their legal assistant at $60.00 per hour. Duplicating expenses of $156.20 are also sought. The total sought in fees and expenses in connection with the appeal is $15,845.72.

■ Since the Court finds that plaintiffs have prevailed on a significant issue for which relief was sought on which the government was not substantially justified, a fee award must follow. However, since defendants were substantially justified with respect to many issues, the Court will reduce the attorney and legal assistant hours requested for the enforcement motions by half. The Court determines that an increase in the cost of living justifies a higher fee than the statutory cap as contemplated by 28 U.S.C. § 2412(d)(2)(A)(ii).

■ The Court notes that defendants cite no authority for the proposition that the government may prove that its appeal from the enforcement decisions was substantially justified, and thereby requiring a denial of plaintiffs' application for fees in connection with the appeal. The Court reads *Commissioner, INS v. Jean,* 496 U.S. at 158–60, 110 S.Ct. at 2318–2320, and *Jones v. Lujan,* 887 F.2d at 1099–1100, as controlling. If the Court finds, as found above, that the government was not substantially justified in its underlying action or litigation position, any appeal of the underlying action that is affirmed does not require the Court to make a second determination about the government's substantial justification on appeal.

The Court, therefore, will award plaintiffs $25,376.49 in attorney and legal assis-

tant fees for their original petition.[11] In addition, the Court will award all hours sought in connection with the appeal in the amount of $15,247.01.[12] All duplicating expenses in both petitions will be awarded in the amount of $1,356.20. The grand total of the award of fees and expenses is $41,-979.70.

a way to compensate the petitioner in that case for the delay as a "special factor" allowable under the EAJA. This Court, as noted above, finds nothing "special" about the delay in payment. The Court chooses the most current rate available for the sake of simplicity and, as mentioned, because it is an engine for efficient use of judicial resources. *See generally Oklahoma Aerotronics, Inc. v. United States,* 943 F.2d 1344, 1348–49 (D.C.Cir.1991) (citing *Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 2468, 105 L.Ed.2d 229 (1989); *Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1328–29 (D.C.Cir.1982); *Copeland v. Marshall,* 641 F.2d 880, 893 (D.C.Cir.1980)) (courts may take delay into account in determining reasonable attorneys' fee, but may not award interest as such).

**11.** The calculations are as follows: three hundred eighty-one (381) attorney hours divided by two equals 190.5, times $112.58 per hour (*see supra* note 10) equals $21,446.49. One hundred thirty-one (131) legal assistant hours divided by two equals 65.5, times $60.00 per hour equals $3,930.00. These two figures add up to $25,-376.49.

**12.** The calculations are as follows: one hundred thirty-four point five (134.5) hours of attorney time, multiplied by $112.58 per hour (*see supra* note 10) equals $15,142.01. One and three-quarter (1.75) hours of legal assistant time, multiplied by $60.00 per hour equals $105.00. These two figures combine to equal $15,247.01.